STATE OF NORTH CAROLINA v. IVEY SWEEZY, JR.

No. 56

(Filed 21 December 1976)

1. **Constitutional Law § 32— refusal to remove counsel without hearing — no error**

The trial court in a first degree burglary case did not err in refusing, without a hearing, to remove defendant's counsel and appoint two "black lawyers" in their stead, since no irreconcilable conflict or breakdown in communication between defendant and his counsel was demonstrated; defendant merely stated that he felt that his counsel were not going to represent him properly without pointing

State v. Sweezy

to any act or omission indicating incompetence or lack of diligence on the part of his counsel; and the record showed no disagreement between defendant and his counsel as to trial tactics.

2. Criminal Law § 66— pretrial photographic identification — admissibility of in-court identification

Evidence in a first degree burglary case was sufficient to support the trial court's finding that there was nothing in a pretrial photographic examination of pictures, including that of defendant, by the prosecuting witness which was likely to give rise to any misidentification where such evidence tended to show that the witness was shown eight photographs two days after the burglary, two of which were of defendant; the witness immediately picked out the pictures of defendant as depicting the man who entered her house; and the officer who showed the photographs to the victim made no suggestions to the witness as to which pictures she should pick out.

3. Constitutional Law § 32; Criminal Law § 66— lineup — right to counsel — admissibility of in-court identification

An accused is entitled to counsel during an in-custody lineup and when counsel is not provided, (1) testimony of witnesses that they identified accused in the lineup is inadmissible and (2) an in-court identification of an accused by a lineup witness is inadmissible unless it is first shown by clear and convincing evidence on *voir dire* that the in-court identification is not tainted by the illegal lineup.

4. Criminal Law § 66— lineup — no finding as to propriety — in-court identification properly allowed

Though the trial court in a first degree burglary case should have made findings as to whether a lineup involving defendant was unnecessarily suggestive and conducive to irreparable misidentification, it was not error for the court to allow an in-court identification of defendant by the prosecuting witness where there was ample clear and convincing evidence that such identification was based on the witness's observation of defendant at the crime scene.

5. Constitutional Law § 32— defendant in custody on separate charge — presence in lineup — no right to counsel

Where defendant at the time of a challenged lineup was in custody on a charge of larceny of an automobile which had no connection with the burglary charge under consideration, the lineup was made up of other inmates of the jail and one employee of the law enforcement center, and an officer asked the group if any of them wanted a lawyer but there was no reply, defendant's right to counsel had not attached.

6. Jury § 7— juror with opinion on guilt — challenge for cause — denial proper

The trial court did not err in denying defendant's challenge for cause of a juror who stated that he had formed an opinion as to defendant's guilt or innocence from items he had read but that he could render a fair verdict based solely on the evidence presented and the charge of the court.

7. **Constitutional Law § 31; Criminal Law § 98— disruptive behavior of defendant — removal from courtroom — no denial of right to confrontation**

> Defendant was not deprived of his rights to a fair trial and to confront the witnesses against him by his removal from the courtroom during the course of the trial, since defendant's removal came after numerous abusive and profane outbursts by him, warnings by the judge that continued interruptions would require his removal, exercise by the judge of his contempt powers in an effort to control defendant, and instructions by the judge that defendant could return to the courtroom as soon as he decided to conduct himself in a proper manner.

8. **Burglary and Unlawful Breakings § 5— first degree burglary — breaking — sufficiency of evidence**

> Evidence in a first degree burglary case was sufficient to show a breaking where the prosecuting witness testified that the door in which she saw the burglar standing had not been locked but had been closed "all the way," the witness having closed the door herself.

9. **Burglary and Unlawful Breakings § 5— first degree burglary — entry without permission — sufficiency of evidence**

> Evidence in a first degree burglary case was sufficient to support a reasonable inference by the jury that a man seen by the prosecuting witness entering her house did so without the permission of the occupants where such evidence tended to show that the prosecuting witness was surprised to see someone entering her house at 11:45 p.m., the prosecuting witness began to retreat into her home and scream for her husband when she was confronted with the intruder, and the police were summoned.

10. **Burglary and Unlawful Breakings § 5— first degree burglary — intent to commit larceny — sufficiency of evidence**

> Evidence in a first degree burglary case was sufficient to show defendant's intent to commit larceny at the time he broke and entered a home where such evidence tended to show that defendant had partially entered the enclosed porch of the home, he had a ladies' stocking covering his right hand and arm, and, when confronted by an occupant of the house, he motioned her to keep quiet but fled when she began to scream.

11. **Constitutional Law § 36; Burglary and Unlawful Breakings § 8— first degree burglary — life imprisonment — no cruel and unusual punishment**

> Imposition of a life sentence upon a conviction for first degree burglary does not constitute cruel and unusual punishment.

APPEAL by defendant from *Friday, J.,* 26 January 1976 Session of CLEVELAND Superior Court.

Defendant was charged with the crime of first-degree burglary.

The State offered evidence which tended to show that on 7 September 1975, at about 11:45 p.m., Connie Elmore Grigg of the Lawndale Section of Cleveland County, North Carolina, saw defendant standing partially in and partially out of the door leading from the outside into her enclosed side porch. She had closed but had failed to lock this door. Defendant, who had a ladies' stocking on his right hand and arm, motioned for the witness to come to him. She began to scream and defendant left.

Defendant, by his own testimony and that of several other witnesses, offered evidence tending to show that he was in Hickory, North Carolina, at the time the crime was allegedly committed.

The jury returned a verdict of guilty of first-degree burglary and defendant appealed from judgment imposing a sentence of life imprisonment.

*Attorney General Edmisten, by Assistant Attorney General Thomas B. Wood, for the State.*

*Michael K. Hodnett, Assistant Public Defender, for the defendant appellant.*

BRANCH, Justice.

[1] Defendant contends that he was denied a fair trial because the trial judge, without giving him a hearing, denied his request that his attorneys be removed. Defendant was represented by the Office of the Public Defender and Mr. Fred A. Flowers of the Shelby Bar, who was appointed by the court to assist in the defense.

The record reveals the following pertinent exchanges:

DEFENDANT: I want me another lawyer. I feel like Mr. Hodnett and them are not going to represent me properly.

COURT: You sit down. You have an attorney.

DEFENDANT: I feel like he's not going to represent me properly.

COURT: Do you hear me? You have two fine attorneys there and they are representing you properly and I better not hear any more of those outbursts. You continue this

and I'm going to gag you. I'm giving you fair warning. You continue the outbursts in the presence of this Court and I'm going to have you gagged, do you understand that? Let the record so show.

DEFENDANT: I know my constitutional rights and my right to speak for myself.

\*    \*    \*

COURT: Any further witnesses?

MR. HODNETT: Yes, sir. We call Mr. Sweezy.

DEFENDANT: Don't put that man on the stand.

(Mr. Flowers and Mr. Hodnett and Mr. Morris approach the bench for discussion off the record.)

COURT: Let the record show that at the conclusion of the examination, direct examination and cross, of the defendant's voir dire witness number one, both counsel for the defendant approached the bench as they properly should have done and advised the Court that the defendant has made a motion that they be removed as trial counsel in this case. Let the record further show that this Court is of the opinion that both counsel are doing a very credible job in his defense; that we are now in the trial; that this is a very serious felony; that the defendant needs counsel; and the Court will DENY his motion to remove them as counsel. All right, any further evidence on the voir dire?

\*    \*    \*

DEFENDANT: Judge, Your Honor, I'd like to have two black lawyers. I feel like these counsel are not going to represent me properly.

COURT: Please sit down, Mr. Sweezy.

DEFENDANT: Could I have two black lawyers?

COURT: Would you please sit down, Mr. Sweezy.

DEFENDANT: My name is Ivey.

COURT: Ladies and gentlemen of the jury, could I ask you to step in the jury room a minute, please.

JURY EXITS THE COURTROOM.

State v. Sweezy

COURT: Mr. Sweezy, I'm informing you that proper decorum in the courtroom does not permit this type of action on your part. Should you do this one more time, I'm going to exclude you from the courtroom again. All right, Mr. Sheriff, let the jury come back in.

\*      \*      \*

COURT: Do you want to testify or do you not, Mr. Sweezy? You will answer this Court. Do you want to testify or do you not want to testify? You will answer me yes or no.

DEFENDANT: I fired Hodnett and Flowers here.

Unquestionably it is the right of an indigent defendant to have competent counsel appointed to represent him at his trial. *Gideon v. Wainwright*, 372 U.S. 335, 9 L.Ed. 2d 799, 83 S.Ct. 792; *State v. Robinson*, 290 N.C. 56, 224 S.E. 2d 174. An accused has the right to conduct his own defense without counsel but he does not have the right to have the attorney of his choice appointed by the court. *State v. Robinson, supra.* Neither does the right to competent court-appointed counsel include the privilege to insist that counsel be removed and replaced with other counsel merely because defendant becomes dissatisfied with his attorney's services. *United States v. Young*, 482 F. 2d 993; *State v. Robinson, supra; State v. McNeil*, 263 N.C. 260, 139 S.E. 2d 667.

In *United States v. Young, supra,* defendant contended that he was deprived of effective assistance of counsel. He expressed suspicion that his counsel had communicated confidential defense matters to the prosecutor. The trial judge summarily rejected this suggestion on the basis of his long-standing knowledge of counsel's professional conduct. Defendant then posed a more general objection by stating: "Well, Your Honor, I am not trying to tell you that you don't know Mr. Young. [Defendant's counsel] I feel that he won't represent me." Holding that the trial judge's failure to appoint another attorney for the defendant without conducting a hearing was not reversible error, the Fifth Circuit Court of Appeals stated:

> . . . Unless a Sixth Amendment violation is shown, whether to appoint a different lawyer for an indigent criminal defendant who expresses dissatisfaction with his court-appointed counsel is a matter committed to the sound dis-

cretion of the district court. The Second Circuit has recently summarized the applicable principles:

> In order to warrant a substitution of counsel during trial, the defendant must show good cause, such as a conflict of interest, a complete breakdown in communication or an irreconcilable conflict which leads to an apparently unjust verdict. *Brown v. Craven,* 424 F. 2d 1166 (9th Cir. 1970) ; *United States v. Grow,* 394 F. 2d 182, 209 (4th Cir.), cert. denied, 393 U.S. 840, 89 S.Ct. 118, 21 L.Ed. 2d 111 (1968) ; *United States v. Gutterman,* 147 F. 2d 540 (2d Cir. 1945). If a court refuses to inquire into a seemingly substantial complaint about counsel when he has no reason to suspect the bona fides of the defendant, or if on discovering justifiable dissatisfaction a court refuses to replace the attorney, the defendant may then properly claim denial of his Sixth Amendment right. *Brown v. Craven, supra.* In the absence of a conflict which presents such a Sixth Amendment problem, the trial court has discretion to decide whether to grant a continuance during the course of trial for the substitution of counsel, and that decision will be reversed only if the court has abused its discretion.

*United States v. Calabro,* 2d Cir. 1972, 467 F. 2d 973, 986. *See also United States v. Sexton, supra; United States v. Morrissey,* 2d Cir. 1972, 461 F. 2d 666; *Brown v. Craven,* 9th Cir. 1970, 424 F. 2d 1166; *Bowman v. United States,* 5th Cir. 1969, 409 F. 2d 225, cert. denied, 398 U.S. 967, 90 S.Ct. 2183, 26 L.Ed. 2d 552, reh. denied, 400 U.S. 912, 91 S.Ct. 128, 27 L.Ed. 2d 152; *United States v. Grow,* 4th Cir. 1968, 394 F. 2d 182, 209, cert. denied, 393 U.S. 840, 89 S.Ct. 118, 21 L.Ed. 2d 111; *United States v. Gutterman,* 2d Cir. 1945, 147 F. 2d 540; *United States v. Mitchell,* 2d Cir. 1943, 138 F. 2d 831.

It would have been the better practice for the trial judge to have excused the jury and allowed defendant to state his reasons for desiring other counsel. If no good reason was shown requiring the removal of counsel, then the court should have determined whether the defendant actually desired to conduct his own defense.

Even so, this record does not reflect a substantial claim that defendant has been denied effective assistance of counsel. No irreconcilable conflict or breakdown in communication between defendant and his counsel has been demonstrated. Defendant merely stated that he *felt* that his counsel were not *going* to represent him properly without pointing to any act or omission indicating incompetency or lack of diligence on the part of his counsel. Neither does the record show any disagreement between defendant and his counsel as to trial tactics. Defendant did not request that he be allowed to represent himself, but only indicated a desire that his counsel be replaced "by two black lawyers." Defendant's courtroom behavior gave the trial judge every right "to suspect the bona fides of the defendant." Although there was no formal hearing on defendant's request, the record makes it crystal clear that defendant did not stand on formalities but made his wishes and opinions known frequently and vociferously. We, therefore, find no reversible error in the trial judge's refusal, without a hearing, to remove defendant's counsel and appoint two "black lawyers" in their stead.

Defendant assigns as error the trial judge's denial of his motion to suppress the identification testimony of the witness Connie Elmore Grigg. He argues that an illegal lineup and an impermissibly suggestive photographic procedure irreparably tainted the in-court identification.

The trial judge conducted a *voir dire* hearing at which he heard evidence as to the pretrial photographic identification and as to the lineup. On *voir dire,* Mrs. Grigg, in substance, testified that on the night of 7 September 1973, at about 11:45 p.m., she went into her dining room to pick up some bills. Her bathroom opened to an enclosed side porch and the door to the lighted bathroom was open. The dining room was lighted by a chandelier which was about nine feet from the outside door leading to the enclosed side porch. She was about four feet from the entry from the side porch into her dining room when she first observed defendant. He had on blue pants, a blue short-sleeved shirt, and was wearing a ladies' stocking up to his elbow on his right arm. He appeared to be about five feet seven or eight inches tall and weighed approximately 175 pounds. Defendant was partially on the porch and he had his right hand on the door knob. He began to motion her to come to him with his right arm. She screamed and defendant began to shake his head

"for me to hush screaming and doing his mouth like he was saying s-h-h-h and shaking his head no and he was also frowning." Defendant then left. The door was closed but not locked prior to the time that she first observed defendant. She positively identified defendant as the man she saw in her home on the night of 7 September 1973. She stated that "there is good light out on the side porch when you have the dining room light on."

Mrs. Grigg further testified that two days after the burglary, Officer Costner brought eight photographs to her place of employment. At his request, she looked at these photographs and found that there were two pictures of defendant in the group. She immediately picked out the two pictures of defendant as depicting the man who entered her house on the night of 7 September 1973. She did not look at the back of any of the photographs. It was shown that one of defendant's pictures contained the writing "North Carolina Prison Department, Raleigh." Two of the pictures (other than pictures of defendant) contained the writing "Cleveland County Sheriff's Department." Another contained the words "Mecklenburg County" on its face. All the pictures were in approximately the same condition and defendant did not appear to be wearing prison clothes. Mrs. Grigg stated that the officer made no suggestion to her concerning the photographs. The record contains the following pertinent exchanges:

Q. You're telling the Court the lineup did not make you feel any more positive you had the right person?

A. Okay, I picked the same person out of the pictures that was in the lineup, not because he was one in the pictures, because he is the man that was in my home; and I was even more positive after I went to the lineup that it was the same person that was in my home.

\* \* \*

Q. And the fact that you picked him out of the photographs, that made you feel more positive and more sure, did it not? Not from anything said about it, but the fact you were able to pick him out of the pictures?

A. Not from picking him out of the pictures because that was the man.

Defendant's father, Ivey Sweezy, Sr., testified on *voir dire* that he took Ivey, Jr., to Hickory on the night of 7 September 1973 at about 8:00 or 9:00. Defendant did not own and never wore short-sleeved shirts. He pointed to a large scar on defendant's face which he had carried since childhood. In her description of defendant, the prosecuting witness did not mention a scar.

[2] We first consider the effect of the pretrial photographic procedures. In this connection, at the conclusion of the *voir dire,* the court found and concluded:

> The Court finds from the prosecuting witness' testimony that she did not turn these photographs over. Also, the Court finds that the officer made no suggestions whatsoever to her about what photographs she should pick out; that the photographs were merely handed to her with the request that she examine them and see if she could identify the man who allegedly committed the burglary in her home; that the prosecuting witness then opened the envelope and examined the photographs on the face and that she immediately picked out the defendant in this action. That the photograph which she picked out was that of Sweezy and has been marked as Exhibit No. 3.

> *       *       *

> The Court finds there was nothing suggestive in this photographic identification procedure which was likely to give rise to any misidentification and that it was properly carried out and that under the Sixth Amendment, the defendant was not entitled to counsel at this stage; that it is not a critical stage.

> The Court therefore concludes there was nothing suggestive at all in the photographic identification which is likely to give rise to misidentification.

The use of photographs for the purpose of identifying an accused is an approved procedure and convictions based on an in-court eyewitness identification tainted by a pretrial identification by photographs will be set aside on that ground only if the photographic identification procedure was "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States,* 390 U.S. 377, 19 L.Ed. 2d 1247, 88 S.Ct. 967; *State v. Tuggle,* 284

N.C. 515, 201 S.E. 2d 884; *State v. Lock,* 284 N.C. 182, 200 S.E. 2d 49.

There was ample evidence in this record to support the trial judge's finding that there was nothing in the photographic examination "which was likely to give rise to any misidentification." We are, therefore, bound by this finding. *State v. Tuggle, supra; State v. Morris,* 279 N.C. 477, 183 S.E. 2d 634.

[3, 4] We next consider the effect of the challenged lineup. It is well settled that an accused is entitled to counsel during an in-custody lineup and when counsel is not provided, (1) testimony of witnesses that they identified accused in the lineup is inadmissible and (2) an in-court identification of an accused by a lineup witness is inadmissible unless it is first shown by clear and convincing evidence on *voir dire* that the in-court identification is not tainted by the illegal lineup. *United States v. Wade,* 388 U.S. 218, 18 L.Ed. 2d 1149, 87 S.Ct. 1926; *State v. Bass,* 280 N.C. 435, 186 S.E. 2d 384; *State v. Wright,* 274 N.C. 84, 161 S.E. 2d 581, *cert. denied,* 396 U.S. 934, 24 L.Ed. 2d 232, 90 S.Ct. 275. An accused's right to counsel attaches only at or after the time adversary judicial proceedings have been instituted against him by formal charge, preliminary hearing, indictment or arraignment. *Kirby v. Illinois,* 406 U.S. 682, 32 L.Ed. 2d 411, 92 S.Ct. 1877; *State v. Henderson,* 285 N.C. 1, 203 S.E. 2d 10. Nevertheless, the due process clause forbids a lineup which is unnecessarily suggestive and conducive to irreparable mistaken identification. *Neil v. Biggers,* 409 U.S. 188, 34 L.Ed. 2d 401, 93 S.Ct. 375; *Stovall v. Denno,* 388 U.S. 293, 18 L.Ed. 2d 1199, 87 S.Ct. 1967. Here, the trial judge found that the lineup was illegal because defendant was not warned of his constitutional rights at a critical stage of the prosecution. We assume that the trial judge referred to defendant's right to have counsel present at the lineup proceeding when he made this finding. He made no finding of fact as to whether the lineup was so suggestive and conducive to irreparable mistaken identification as to be illegal.

[5] At the time of the challenged lineup defendant was in custody on a charge of larceny of an automobile which had no connection with the burglary charge now before us. Defendant was placed in the lineup with other inmates of the jail and one employee of the law enforcement center. Officer Barbee asked the group if any of them wanted a lawyer and there was no

reply. Under these circumstances, defendant's right to counsel had not attached. However, the trial judge should have made findings as to whether the lineup was unnecessarily suggestive and conducive to irreparable misidentification.

Before making his ruling admitting the identification testimony into evidence, the trial judge found:

> Therefore, the Court finds that the State has established by clear and convincing proof that the in-court identification of this defendant by the prosecuting witness was on independent origin based on the observation by this witness of the defendant at the scene of this alleged burglary on the night in question and that there is nothing impermissibly suggestive about it.

The evidence shows that the witness, Connie Elmore Grigg, had ample opportunity to observe defendant in a well-lighted area of her home while standing within eight feet from him. She gave a description of defendant, the clothing he wore, the motions he made, and his facial expressions. She stated that the light was shining on his face and that she identified defendant because "he is the man that was in my home." Even had the lineup been illegal, and had the pretrial photographic procedures been impermissibly suggestive, there was ample clear and convincing evidence that the in-court identification was of independent origin. Thus, the trial judge correctly denied defendant's motion to suppress the identification testimony of the witness Connie Elmore Grigg.

[6]  Defendant contends that the trial court erred in denying his challenge for cause of juror Ned Smith.

In the course of his *voir dire* examination juror Ned Smith revealed that he was the general manager of the Shelby Daily Star, the local daily newspaper. He stated that he had become "knowledgeable" about this case from a number of items he had read, and that he had formed an opinion as to defendant's guilt or innocence. Thereupon the following exchange occurred:

> MR. HODNETT: Challenge Mr. Smith for cause.

> COURT: Mr. Smith, you informed both the Solicitor and the defense attorney that you could disabuse your mind of everything you heard and start with a fresh mind—wash

out all you have heard out of your mind and receive the evidence in this case and enter a fair verdict on that evidence?

MR. SMITH: Yes, I feel I'm capable of that.

COURT: And you realize what you heard was not under oath?

MR. SMITH: Absolutely.

COURT: I'm going to DENY the motion.

\*     \*     \*

MR. HODNETT: Do you feel like when the Judge instructs you as to the evidence and as to the law, that you can put aside everything that you heard outside this courtroom and just use what you heard in this courtroom and what His Honor has to tell you to form your verdict in this case?

MR. SMITH: I think I could.

MR. HODNETT: We renew the motion as to Mr. Smith for cause—as to the breaking and entering and having formed an opinion in the case.

COURT: Motion DENIED. The juror said he would base his verdict on what happened in the courtroom.

*State v. DeGraffenreid*, 224 N.C. 517, 31 S.E. 2d 523, is a case strikingly similar on its facts to the present one. There the juror, Pattishall, admitted that he had formed an opinion adverse to the defendant as a result of several articles he had read in the local newspaper. He stated that it would require evidence to remove this preconceived opinion from his mind. Upon questioning by the court, the juror further stated that he could render a fair and impartial verdict based solely on the evidence presented and the charge of the court. In upholding the trial court's denial of the challenge for cause, this Court, through Chief Justice Stacy, said:

First, in respect to the challenge to the juror Pattishall, it is observed that while he had formed some opinion adverse to the defendant, he further stated he could render a fair and impartial verdict entirely in accordance with the law and the evidence, uninfluenced by any previously

formed opinion. This suffices to support the court's finding of indifferency. . . .

It is provided by G.S., 9-14, that the judge "shall decide all questions as to the competency of jurors," and his rulings thereon are not subject to review on appeal unless accompanied by some imputed error of law.

*Accord: State v. Dixon,* 215 N.C. 438, 2 S.E. 2d 371; *State v. Bailey,* 179 N.C. 724, 102 S.E. 406.

In instant case juror Smith stated that he could render a fair verdict based solely on the evidence presented and the charge of the court, uninfluenced by his previously formed opinion. We find no error of law or abuse of discretion in the trial judge's ruling denying defendant's challenge for cause.

[7] Defendant next argues that his removal from the courtroom during the course of the trial deprived him of his rights to a fair trial and to confront the witnesses against him.

In addition to defendant's constant demands that new counsel be appointed to represent him, he interrupted the trial proceedings with numerous abusive and profane outbursts. The following exchanges are indicative of the course of conduct which defendant pursued throughout the trial:

DEFENDANT [interrupting the testimony of his brother]: Did you tell them you're my son?

COURT: Ladies and gentlemen of the jury, I'm sorry, but I'm going to have to ask you to step into the jury room a minute.

JURY EXITS THE COURTROOM.

DEFENDANT: What you trying to do, boy? I don't go for that damn s—. The world is coming to an end, Your Honor.

COURT: Sheriff, take him out.

DEFENDANT: God-a-mighty.

COURT: Take him out.

* * *

(Defendant gets up out of the witness chair.)

---

State v. Sweezy

---

COURT: Just a minute, Mr. Sweezy. Be seated there. Sit him down there.

(Deputies seat defendant in witness chair.)

DEFENDANT: I don't have to say nothing.

MR. HODNETT: You don't want to say anything else? Your Honor, if he wants to come down.

COURT: The State has to have an opportunity to cross examine him.

CROSS EXAMINATION by Mr. Morris:

Q. What have you been tried and convicted of, Mr. Sweezy?

(No response)

COURT: You will answer that question, Mr. Sweezy.

(No response)

COURT: I again instruct you to answer the Solicitor's question.

A. We want facts. I take the Fifth Amendment on that, because we want the facts.

COURT: Ladies and gentlemen, will you step in the jury room, please.

JURY EXITS THE COURTROOM.

DEFENDANT: May I step down?

COURT: No, you may not. I find this defendant is again in direct contempt of this Court for refusal to answer the Court's order. This is the third time, now, I find you in contempt. Now, are you going to answer the Solicitor's questions or not? Tell me right now.

(No response)

COURT: Did you hear me? I said for you to answer me.

DEFENDANT: I don't have to answer no questions.

COURT: All right, I again adjudge you to be in contempt of Court for the fourth time. Mr. Solicitor, do you desire to examine this man any further?

MR. MORRIS: No, sir.

COURT: Let him step down, Sheriff. Let the jury come back in.

DEFENDANT: I know you're trying to kill me in prison and all that. Trying to railroad me.

COURT: Remove him from the courtroom, Mr. Sheriff. Take the defendant out of the courtroom.

Defendant also broke in on the testimony of other witnesses, accusing one of lying and instructing another to step down before he had completed his testimony. He totally ignored the court's repeated admonitions. At one point, defendant disrupted the trial by turning and facing away from the proceedings. He continually talked back to the judge, addressing him in such disrespectful terms as "boy," "Fred," and "hypocrite." He accused the trial judge of conducting a "kangroo court." Defendant's unruly and disruptive behavior interrupted the proceedings thirteen times and caused the trial judge to have him removed from the courtroom on six different occasions.

It is the right of an accused in every criminal prosecution to be present at each stage of his trial. *State v. Pope,* 257 N.C. 326, 126 S.E. 2d 126. However, that right may be lost by the consent or misconduct of the defendant. *Snyder v. Massachusetts,* 291 U.S. 97, 78 L.Ed. 674, 54 S.Ct. 330; *State v. O'Neal,* 197 N.C. 548, 149 S.E. 860.

In *Illinois v. Allen,* 397 U.S. 337, 25 L.Ed. 2d 353, 90 S.Ct. 1057, the United States Supreme Court considered the precise question now before this Court: "[W]hether an accused can claim the benefit of this constitutional right to remain in the courtroom while at the same time he engages in speech and conduct which is so noisy, disorderly, and disruptive that it is exceedingly difficult or wholly impossible to carry on the trial." The Supreme Court, speaking through Justice Black, held that removal of a defendant is a constitutionally permissible measure when his conduct is such as to impede the due administration of justice:

. . . [W]e explicitly hold today that a defendant can lose his right to be present at trial if, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on

with him in the courtroom. Once lost, the right to be present can, of course, be reclaimed as soon as the defendant is willing to conduct himself consistently with the decorum and respect inherent in the concept of courts and judicial proceedings.

It is essential to the proper administration of criminal justice that dignity, order, and decorum be the hallmarks of all court proceedings in our country. The flagrant disregard in the courtroom of elementary standards of proper conduct should not and cannot be tolerated. We believe trial judges confronted with disruptive, contumacious, stubbornly defiant defendants must be given sufficient discretion to meet the circumstances of each case. No one formula for maintaining the appropriate courtroom atmosphere will be best in all situations. We think there are at least three constitutionally permissible ways for a trial judge to handle an obstreperous defendant like Allen: (1) bind and gag him, thereby keeping him present; (2) cite him for contempt; (3) take him out of the courtroom until he promises to conduct himself properly.

Here the trial judge exercised considerable forebearance in light of defendant's repeated, abusive outbursts. He expressly warned defendant that his continued interruptions would require his removal. Defendant was so warned on four occasions before he was removed from the courtroom for the first time. The trial judge exercised his contempt powers four times in attempts to control defendant's behavior so that he could remain present throughout the trial. Even in removing defendant from the courtroom, the trial judge attempted to mitigate the adverse consequences of defendant's absence from the trial. On each occasion the judge excused the jury before having defendant removed in order to prevent any possible prejudice to defendant. He specifically informed defendant that he could return to the courtroom as soon as he decided to conduct himself in a proper manner. Upon request, the trial judge placed defendant in an adjoining room where he could confer with counsel during the trial.

It is apparent that the trial judge took every precaution to protect the rights of defendant. When defendant continued to disrupt the proceedings he waived his right to be present at his trial. His removal was an appropriate and necessary measure

to preserve the dignity of the judicial process and to promote the efficient administration of justice.

We hold that the trial judge acted properly in removing defendant from the courtroom. Defendant's Assignments of Error Nos. 5, 9 and 19 are overruled.

By his Assignments of Error Nos. 11 and 20 defendant attacks the trial judge's denial of his motions for judgment as of nonsuit.

On a motion testing the sufficiency of the evidence to go to the jury, the evidence must be considered in the light most favorable to the State and every reasonable inference drawn in favor of the State. *State v. McNeil,* 280 N.C. 159, 185 S.E. 2d 156. When so viewed, if there is any competent evidence to support every essential element of the crime charged, the trial judge must overrule the motion and submit the case to the jury. *State v. Bell,* 285 N.C. 746, 208 S.E. 2d 506; *State v. Davenport,* 227 N.C. 475, 42 S.E. 2d 686.

First-degree burglary is defined as the unlawful breaking and entering of an occupied dwelling or sleeping apartment in the nighttime with the intent to commit a felony therein. G.S. 14-51; *State v. Bell, supra.*

**[8]** Defendant first argues that there was insufficient evidence to show a "breaking." It is well established that the mere pushing or pulling open of an unlocked door constitutes a breaking. *State v. Tippett,* 270 N.C. 588, 155 S.E. 2d 269; *State v. McAfee,* 247 N.C. 98, 100 S.E. 2d 249. Here Connie Elmore Grigg testified as follows: "The door was not locked, because I had just come back from the shop at 10:00. The door was closed all the way. I shut the door myself. It's not possible that it was open, I closed the door." This was sufficient evidence of a breaking.

**[9]** Next defendant contends that there was no evidence showing that the entry into the Griggs' house was unlawful, *i.e.,* made without the permission of the occupants. Certainly there was evidence from which such an inference could be drawn. Mrs. Grigg testified as to her surprise in seeing someone entering her enclosed porch at that time of the night. When confronted with this intruder, she began to retreat into her home and to scream for her husband. The police were summoned immediately. This is hardly the type of reception given to an invited guest

in one's home. This evidence is sufficient to support a reasonable inference by the jury that the man seen entering the Grigg house did so without the permission of the occupants.

[10]   Finally defendant asserts that there was no proof of an intent to commit larceny at the time of the breaking and entering. In *State v. McBryde*, 97 N.C. 393, 1 S.E. 925, this Court addressed the question of the quantum of proof required to show an intent to commit larceny:

> . . . The intelligent mind will take cognizance of the fact, that people do not usually enter the dwellings of others in the night time, when the inmates are asleep, with innocent intent. The most usual intent is to steal, and when there is no explanation or evidence of a different intent, the ordinary mind will infer this also. The fact of the entry alone, in the night time, accompanied by flight when discovered, is some evidence of guilt, and in the absence of any other proof, or evidence of other intent, and with no explanatory facts or circumstances, may warrant a reasonable inference of guilty intent.

*See also State v. Accor* and *State v. Moore*, 277 N.C. 65, 175 S.E. 2d 583.

Here there was evidence showing that defendant had partially entered the enclosed porch of the Grigg home. He had a ladies' stocking covering his right hand and arm. When confronted by Mrs. Grigg, he motioned to her to keep quiet and when she began to scream, he fled. Under the requirements of *McBryde* the State has adduced sufficient evidence of an intent to commit larceny at the time of the breaking and entering to repel defendant's motions for nonsuit.

We hold that the trial judge properly submitted the case to the jury. These assignments of error are, therefore, over-ruled.

[11]   Finally, defendant argues that the imposition of the life sentence in this case constituted cruel and unusual punishment.

G.S. 14-52, in part, provides that "any person convicted of the crime of burglary in the first degree shall be imprisoned for life in the State's prison."

This Court has consistently held that when punishment does not exceed the limits fixed by statute, it cannot be classified as

State v. Sweezy

cruel and unusual in a constitutional sense. *State v. Barber,* 278 N.C. 268, 179 S.E. 2d 404; *State v. Rogers,* 275 N.C. 411, 168 S.E. 2d 345, *cert. denied,* 396 U.S. 1024, 24 L.Ed. 2d 518, 90 S.Ct. 599; *State v. Davis,* 267 N.C. 126, 147 S.E. 2d 570. However, in *Woodson v. North Carolina,* _____ U.S. _____, 49 L.Ed. 2d 944, 96 S.Ct. 2978, the United States Supreme Court held that North Carolina's mandatory death sentence violated the Eighth and Fourteenth Amendments. In so holding the Court, *inter alia,* stated:

> . . . "The North Carolina Statute provides no standards to guide the jury in determining which murderers shall live and which shall die." . . .
>
> \*   \*   \*
>
> . . . A process that accords no significance to relevant facets of the character and record of the individual offender or the circumstances of the particular offense excludes from consideration in fixing the ultimate punishment of death the possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind. It treats all persons convicted of a designated offense not as uniquely individual human beings, but as members of a faceless, undifferentiated mass to be subjected to the blind infliction of the penalty of death.
>
> . . . While the prevailing practice of individualizing sentencing determinations generally reflects simply enlightened policy rather than a constitutional imperative, we believe that in capital cases the fundamental respect for humanity underlying the Eighth Amendment, see *Trop v. Dulles,* 356 U.S. at 100, 2 L.Ed. 2d 630, 78 S.Ct. 590 (plurality opinion), requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.

Defendant relies on this language from *Woodson* to support his position. He argues that the provisions of G.S. 14-52 require a trial judge to arbitrarily impose a life sentence without exercising any discretion or considering the individual facts of each case.

The fallacy in defendant's position is that throughout the opinion in *Woodson* the Court made it clear that the decision

related only to cases in which the death penalty was imposed. We quote from that opinion:

> This conclusion rests squarely on the predicate that the penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.

We find nothing in *Woodson* or any of the other cases cited by defendant which convinces us that a mandatory life sentence violates any provision of our Federal or State Constitutions. In this jurisdiction the rule is that when a sentence of imprisonment does not exceed the limits fixed by statute, it cannot be classified as cruel and unusual in the constitutional sense.

We have carefully examined this entire record and find no error justifying that the verdict or judgment be disturbed.

No error.