STATE OF NORTH CAROLINA
v.
MICHAEL FELTON HOSCH, JR., Defendant.
No. COA09-583.
Court of Appeals of North Carolina.
Filed January 19, 2010.
This case not for publication
Attorney General Roy Cooper, by Assistant Attorney General Kathleen N. Bolton, for the State.
Mercedes O. Chut for defendant-appellant.
ROBERT C. HUNTER, Judge.
Defendant Michael Felton Hosch, Jr. appeals his convictions for first degree burglary, conspiracy to commit robbery with a firearm, and robbery with a firearm. Defendant primarily argues on appeal that the trial court erred in denying his motion to dismiss all the charges for insufficient evidence. Because, however, the State presented substantial evidence of each element of each offense, the trial court properly submitted the charges to the jury. As we also find defendant's other arguments unpersuasive, we find no error.

Facts
The State's evidence tended to establish the following facts at trial: On 20 September 2007, Jonathan Daniel Tate, his girlfriend Jacquelin Morris, and his cousin Willie Allen were living in a double-wide trailer in Shelby, North Carolina, located behind some storage buildings on the property. Around 9:00 p.m. Mr. Allen saw the silhouettes of three people walking along the fence line of the property toward Mr. Tate's house, two of them carrying what looked like rifles or shotguns. Roughly 15 minutes later, Mr. Tate, talking on his cell phone, walked out of his house to turn off the music in one of the storage buildings where Mr. Allen had been working earlier in the day. As he came out of the building three armed men came around the corner and confronted him. Two of the men were wearing all black and carrying rifles. The third man  later identified as defendant  was wearing a brown jogging suit, had a white mask over his face, and was holding a silver pistol. Defendant was also wearing at least one white glove. All three men had a hat or some other covering over their heads and all three had their guns pointed at Mr. Tate. One of the men threw Mr. Tate's cell phone over a fence into some high grass.
Mr. Tate was ordered to lay down on the ground and defendant, pointing his pistol at him, held him at gunpoint while one of the men in black kicked him in the face and hit him in the head with his rifle. Mr. Tate saw a tattoo on defendant's forearm and noticed that he walked with a limp. While Mr. Tate was being detained outside by defendant, the other two men went around the side of the house and went inside, where Ms. Morris and her son were taking a nap.
Ms. Morris was asleep in one of the bedrooms when a man, dressed in black and carrying a "big rifle," came in and woke her up. The man took her to the kitchen and asked her where "it" was. When Ms. Morris explained that she did not know what "it" was, the man said "money." The man told her to go outside, but she refused because she did not want to leave her son who was still inside the house.
About this time, defendant motioned with his gun for Mr. Tate to get up and walk with his hands in the air to the back door of the house. Mr. Tate entered the kitchen through the back door and was ordered to "[g]et on the ground." Mr. Tate laid down on the floor and defendant stood behind him, pointing his pistol at Mr. Tate. The man in black that had kicked and hit Mr. Tate earlier outside kicked him in the jaw and hit him in the head again with his rifle. The man then reached into Mr. Tate's back pocket and took out roughly $500.00 in cash from Mr. Tate's wallet. Then, while defendant was holding Mr. Tate at gun point, the other two men began "running back and forth room to room" searching the house. One of the men found Ms. Morris' purse and took approximately $45.00 to $50.00 in cash. A black bag filled with change and a pellet gun were also taken. Someone shouted "[s]omebody called the police[,]" and the men got nervous and ran out of the house through the back door.
Both the Cleveland County Sheriff's Department and the Shelby Police Department responded to the 911 call. Investigator Paul Leigh with the Sheriff's Department was the first to arrive at Mr. Tate's residence. He obtained descriptions of the suspects and radioed in BOLOs ("be on the lookout for") regarding the suspects. Sergeant Craig Earwood, with the Police Department, was driving west on Highway 74 en route to the scene when he saw two men near a funeral home located on Highway 74 near Mr. Tate's residence. As he approached them, they took off running west along the side of the highway. One of the men ran north up a side road while the other continued running west on Highway 74. Sgt. Earwood pulled up behind the man running on Highway 74 and stopped him; he was wearing a brown jogging outfit. After frisking the man in the brown jogging suit, Sgt. Earwood placed him in his patrol car and called for a K9 unit to help track the man that had fled north on the side road.
Sgt. Earwood, along with Police Officer Jacob Zaludek, walked back down Highway 74 to the spot where the two men were first seen. Along the guardrail, Sgt. Earwood found a rifle magazine containing ammunition. After other deputies came to collect the magazine, Sgt. Earwood and Officer Zaludek continued to backtrack along Highway 74, finding a black ball cap near a utility pole at the corner of a driveway. They also found a pellet gun near the gate to another driveway. In that same area they also found a white cotton glove.
While Sgt. Earwood and Officer Zaludek were searching along Highway 74, two K9 dogs  Jada and Buster  were taken to Mr. Tate's house, where they began "tracking." Jada, tracking along the fence line near the storage building on the property, found a pair of red and white Nike shoes, a white T-shirt, and a grey or white glove. While following Jada, one of the K9 officers found Mr. Tate's cell phone ringing in the storage area. Buster's K9 handler, Police Officer Danny Halloran, let him loose to begin tracking along the fence line near a wooded area where the pellet gun had earlier been found. Buster sniffed around the wood line and indicated that there was something in the woods. At the wood line, police found a black T-shirt. About 25 feet away from where the T-shirt was found, Officer Halloran noticed a "dark object" in the woods. Shining his flashlight on it, he saw that it was an African-American male dressed in all black clothing laying face down in the woods. The man was later identified as Latydis Dejuan Jordan. Underneath Mr. Jordan, police found a black bag filled with change. Mr. Jordan was frisked and police found in his pocket a single rifle bullet that fit into the rifle magazine Sgt. Earwood had recovered nearby.
Before going to the hospital, Mr. Tate went to try to identify the person in the back of the patrol car on Highway 74. Mr. Tate identified the man as the one who had been wearing the brown jogging suit, mask, and black cap and who had held him at gunpoint outside the house and in the kitchen. Because the man was no longer wearing a mask, Mr. Tate identified him as defendant because they had gone to school together and he recognized defendant's limp. Later, after leaving the hospital, Mr. Tate was driven to the police station where he identified Mr. Jordan as the man who had kicked him in the head and hit him with his gun. Mr. Tate knew Mr. Jordan because they had gone to junior high school together. Sergeant Dan Snellings from the Sheriff's Department took DNA samples from both defendant and Mr. Jordan. The DNA samples, along with other evidence found during the investigation, were sent to the SBI lab for testing. The DNA profile on the black T-shirt matched Mr. Jordan's and the DNA profile on the black ball cap matched defendant's. Defendant could not be excluded as a match for the DNA found on the white T-shirt, but Mr. Jordan was not a match.
Defendant was charged with conspiracy to commit first degree burglary, conspiracy to commit robbery with a firearm, first degree burglary, and robbery with a firearm. Defendant pled not guilty and the case proceeded to trial. At the close of the State's evidence, defendant moved to dismiss all the charges against him for insufficient evidence; the trial court dismissed the charge for conspiracy to commit first degree burglary but denied the motion as to the remaining charges. Defendant did not testify or put on any evidence in his defense. At the close of all the evidence, defendant renewed his motion to dismiss, which was denied. The jury convicted defendant of all charges and the trial court sentenced defendant to two consecutive presumptive-range sentences of 77-102 months imprisonment for the burglary and robbery charges, with a concurrent presumptive-range sentence of 29-42 months imprisonment for the conspiracy charge. Defendant gave notice of appeal in open court.

I
Defendant assigns error to the trial court's admission of the black ball cap, the rifle magazine, and the bullet found in Mr. Jordan's pocket.[1] Defendant argues that the State failed to prove the evidence's relevance under Rule 401 of the Rules of Evidence and, therefore, the trial court committed reversible error by admitting it.
Rule 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C. R. Evid. 401. In criminal cases, Rule 401 is broadly construed so that all evidence that may shed any light on the alleged crime is admissible. State v. Prevatte, 356 N.C. 178, 250, 570 S.E.2d 440, 480 (2002), cert. denied, 538 U.S. 986, 155 L. Ed. 2d 681 (2003). So long as the evidence is relevant, its weight is to be determined by the jury, not the trial court. State v. Sanchez, 328 N.C. 247, 250-51, 400 S.E.2d 421, 424 (1991). Although a trial court's rulings on relevancy technically are not discretionary, and, therefore, are not reviewed under the abuse of discretion standard, they are given great deference on appeal. State v. Lawrence, 191 N.C. App. 422, 427, 663 S.E.2d 898, 901 (2008), aff'd per curiam, 363 N.C. 118, 678 S.E.2d 658 (2009).
With respect to the black ball cap, the State's evidence tended to show that all the assailants were wearing hats. The cap was found near the area where Sgt. Earwood had first seen two men running down Highway 74 away from Mr. Tate's house shortly after he received the BOLOs. The predominant DNA profile from the cap matched defendant's. The cap thus tends to make defendant's participation in the burglary and robbery more probable than without the evidence. Compare State v. Wallace, 104 N.C. App. 498, 502, 410 S.E.2d 226, 228-29 (1991) (holding toboggan found in defendant's car during inventory search was irrelevant because there was "no evidence in the record that masks were used in the commission of the robbery"), appeal dismissed and disc. review denied, 331 N.C. 290, 416 S.E.2d 398, cert. denied, 506 U.S. 915, 121 L. Ed. 2d 241 (1992).
The rifle magazine was found along the guardrail of Highway 74. Although Mr. Tate testified that defendant was carrying a handgun, both he and Ms. Morris testified that the two men dressed in black were both carrying rifles or shotguns. When defendant took Mr. Tate inside the house and ordered him to the floor, Mr. Tate remembered defendant standing behind him pointing his pistol at him while a man in black kicked him in the head and hit him in the head with a rifle. The fact that police found a rifle magazine containing ammunition shortly after the burglary and robbery in which rifles were used and near the scene of the crimes in which defendant was implicated had a tendency to make defendant's participation in the burglary and robbery more probable than without the evidence. See Wallace, 104 N.C. App. at 503, 410 S.E.2d at 229 (concluding evidence of pistol ammunition found shortly after robbery in which pistols were used and in which defendant was implicated was relevant and thus admissible).
As for the rifle bullet admitted into evidence at trial, it was found in Mr. Jordan's pocket after the police found him laying face down in the woods near Mr. Tate's residence. The bullet is either a .223 caliber or 5.56 millimeter round made to be used in an AR15 or M16 rifle. The rifle magazine found along Highway 74 "is specifically designed to hold no other type of bullet" than the one found. Again, the fact that the bullet found in Mr. Jordan's pocket while he was near Mr. Tate's house fit into the rifle magazine found along Highway 74 where defendant and another man were seen running away from the area tends to make defendant's participation in the burglary and robbery more probable than without the evidence. See id. (holding evidence of pistol ammunition found in defendant's possession shortly after robbery in which pistols were used was relevant); State v. Hoover, 14 N.C. App. 154, 156, 187 S.E.2d 453, 454 (holding that "evidence and testimony relating to weapons found in defendant's car and as to the paper bag found concealed on his person" was relevant to attempted robbery prosecution), cert. denied, 281 N.C. 316, 188 S.E.2d 899 (1972).
Defendant nonetheless argues that the State failed to establish the relevance of this evidence because no information was presented addressing the distances between and relative positions of each piece of the disputed evidence and Mr. Tate's house. This Court has held, however, that the lack of evidence definitively showing where pieces of evidence are located in relation to each other impacts the weight of the evidence, not its admissibility. See State v. Lytch, 142 N.C. App. 576, 581, 544 S.E.2d 570, 573 (2001) ("[T]he lack of evidence conclusively showing where in the trailer park the bullets were discovered impacts the weight of the evidence, not its admissibility. The brief time lapse between the murders and discovery of the bullets, the proximity to defendant's last known residence and the fact that one of the bullets was at one time in the murder weapon establishes the evidence's relevancy."), aff'd per curiam, 355 N.C. 270, 559 S.E.2d 547 (2002). Thus the challenged evidence in this case was relevant and the trial court properly admitted the evidence under Rule 401.
Defendant makes no argument that the evidence, although relevant, was inadmissible under Rule 403. Defendant's challenge to the admissibility of the evidence is, therefore, overruled.

II
Defendant next contends that the trial court should have dismissed for insufficient evidence the charges of conspiracy to commit robbery with a firearm, first degree burglary, and robbery with a firearm. On appeal, the trial court's denial of a motion to dismiss for insufficient evidence is reviewed de novo. State v. Smith, 186 N.C. App. 57, 62, 650 S.E.2d 29, 33 (2007). A defendant's motion to dismiss should be denied if there is substantial evidence: (1) of each essential element of the offense charged and (2) of defendant's being the perpetrator of the offense. State v. Scott, 356 N.C. 591, 595, 573 S.E.2d 866, 868 (2002). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." State v. Smith, 300 N.C. 71, 78-79, 265 S.E.2d 164, 169 (1980). "In ruling on a motion to dismiss, the trial court is required to view the evidence in the light most favorable to the State, making all reasonable inferences from the evidence in favor of the State." State v. Kemmerlin, 356 N.C. 446, 473, 573 S.E.2d 870, 889 (2002). Contradictions and discrepancies are for the jury to resolve and do not warrant dismissal. State v. Powell, 299 N.C. 95, 99, 261 S.E.2d 114, 117 (1980).
Defendant first challenges the sufficiency of the evidence regarding his conspiracy conviction. The indictment alleges that defendant conspired with Mr. Jordan to rob Mr. Tate with a firearm.
A "criminal conspiracy" is "an agreement, express or implied, between two or more persons, to do an unlawful act or to do a lawful act in an unlawful way or by unlawful means." State v. Gell, 351 N.C. 192, 209, 524 S.E.2d 332, 343, cert. denied, 531 U.S. 867, 148 L. Ed. 2d 110 (2000). Defendant claims that the State failed to present sufficient evidence of an agreement between himself and Mr. Jordan to support his conspiracy conviction.
Under the law of conspiracy, the agreement need not be express; a mutual, implied understanding is sufficient to constitute a conspiracy. State v. Lawrence, 352 N.C. 1, 24-25, 530 S.E.2d 807, 822 (2000). Direct proof of a conspiracy is rarely available, so the crime generally must be proven, if at all, by circumstantial evidence from which the conspiracy may be legitimately inferred. State v. Horton, 275 N.C. 651, 659, 170 S.E.2d 466, 471 (1969). A conspiracy "may be, and generally is, established by a number of indefinite acts, each of which, standing alone, might have little weight, but, taken collectively, they point unerringly to the existence of a conspiracy." State v. Whiteside, 204 N.C. 710 712, 169 S.E. 711, 712 (1933). Given that direct evidence is rarely available,
the results accomplished, the divergence of those results from the course which would ordinarily be expected, the situation of the parties, and their antecedent relations to each other, together with the surrounding circumstances, and the inference legitimately deducible therefrom, furnish, in the absence of direct proof, and often in the teeth of positive testimony to the contrary, ample ground for concluding that a conspiracy exists.
Horton, 275 N.C. at 660, 170 S.E.2d at 472 (internal citation and quotation marks omitted).
Here, when viewed in the light most favorable to the State, as is required on a motion to dismiss, the evidence tends to show that three men  defendant, Mr. Jordan, and an unknown third individual  were seen walking together along a fence line toward Mr. Tate's residence during the night of 20 September 2007. Two of the men were carrying rifles or shotguns. As Mr. Tate was walking out of one of the buildings on his property, he was confronted by the three men. All three were wearing black or dark clothing and hats or masks.
Mr. Tate was ordered to get down on the ground by one of the men, and one of them kicked him in the face and hit him in the head with his rifle. Defendant held Mr. Tate at gunpoint outside while the other two men entered the house, looking for "money." After about 15 minutes, defendant led Mr. Tate at gunpoint into the house through the backdoor which was now unlocked. One of the men in black ordered Mr. Tate to get on the floor, while defendant stood over him pointing his pistol at him. The man in black then kicked Mr. Tate in the jaw and hit him in the head with his rifle. When Mr. Tate explained that he had some money in his wallet in his back pocket, the man in black reached into his pocket and took roughly $500.00 in cash from his wallet. Defendant continued to hold Mr. Tate at gun point while the other two men searched the house.
Although circumstantial, this evidence is sufficient to permit a jury to reasonably conclude that defendant entered into a conspiracy with Mr. Jordan to rob Mr. Tate with a firearm. See State v. Lamb, 342 N.C. 151, 155-56, 463 S.E.2d 189, 191 (1995) ("We hold that the evidence that defendant met with two other men, one of whom was armed; that the three men drove to the home of the victim; and that the three men then left the vehicle and entered the victim's home, robbed the victim, and shot him is substantial evidence from which the jury could find the robbery was carried out pursuant to a common plan to rob the victim."); State v. Reid, 175 N.C. App. 613, 622-23, 625 S.E.2d 575, 584 (2006) ("The evidence presented at trial tended to show that [the victim] was dragged out of his home by three men armed with firearms, one of which [the victim] identified as defendant. At least two of the assailants entered [the victim's] home looking to steal drugs and money. Finding no drugs or money in [the victim's] home, the three men left the scene, leaving [the victim] lying on the ground shot in the back. This evidence is sufficient to support an inference by the jury that defendant was involved with the two other assailants in a conspiracy to commit the felony of robbery with a firearm . . . ."). The trial court thus properly denied defendant's motion to dismiss the conspiracy charge.
Defendant was also convicted of first degree burglary. The elements of first degree burglary are: (1) breaking (2) and entering (3) at night (4) into the dwelling (5) of another (6) that is occupied (7) with the intent to commit a felony therein. N.C. Gen. Stat. § 14-51 (2007); State v. Person, 298 N.C. 765, 768, 259 S.E.2d 867, 868 (1979). Defendant challenges the evidence regarding the "breaking" element only, arguing that there is "no evidence that any of the intruders employed any force to enter into Mr. Tate's house."
A breaking is defined as any act of force, however slight, "`employed to effect an entrance through any usual or unusual place of ingress, whether open, partly open, or closed . . . .'" State v. Wilson, 289 N.C. 531, 539, 223 S.E.2d 311, 316 (1976) (quoting 13 Am. Jur. 2d Burglary § 8 (1964)). "[T]he mere pushing or pulling open of an unlocked door constitutes a breaking." State v. Sweezy, 291 N.C. 366, 383, 230 S.E.2d 524, 535 (1976).
Here, Mr. Tate testified that there are two entrances to his house, a front and back door. He stated that the back door "stays locked at all times." He also testified that when he walked out the front door to go turn off the music in the storage building, he shut the door behind him. Mr. Tate explained that he "[n]ever" left his doors open for any reason. Ms. Morris also remembered the front door being closed when she laid down to take a nap. While Mr. Tate was being held at gunpoint outside by defendant, Ms. Morris was awoken inside by a man dressed in black holding a rifle. From this evidence, the jury could reasonably conclude that two of the assailants "broke" into the house by opening the front door and entering the residence. See State v. Bowers, 135 N.C. App. 682, 689-90, 522 S.E.2d 332, 337 (1999) (concluding there was sufficient evidence of a breaking where, although "there was no evidence of forced entry," there was evidence that minor rape victim heard her mother lock apartment door behind her as she left for work and victim was later awoken by defendant inside apartment). The trial court, therefore, did not err in submitting the first degree burglary charge to the jury.
Finally, defendant argues that there is insufficient evidence to support his conviction of robbery with a firearm. Under N.C. Gen. Stat. § 14-87(a) (2007), the essential elements of robbery with a firearm are: "(1) an unlawful taking or an attempt to take personal property from the person or in the presence of another, (2) by use or threatened use of a firearm or other dangerous weapon, (3) whereby the life of a person is endangered or threatened." State v. Call, 349 N.C. 382, 417, 508 S.E.2d 496, 518 (1998). "Force or intimidation occasioned by the use or threatened use of firearms, is the main element of the offense." State v. Mull, 224 N.C. 574, 576, 31 S.E.2d 764, 765 (1944). Defendant only challenges the evidence with respect to the third element, maintaining that "[n]o evidence shows an[] actual threat to [Mr. Tate's] life."
Contrary to defendant's contention, Mr. Tate testified that on two separate occasions defendant pointed his pistol at Mr. Tate, keeping him lying down while another assailant kicked him in the face and hit him in the head with a rifle. This evidence is sufficient to support a reasonable conclusion that defendant endangered or threatened Mr. Tate's life with a firearm. See State v. Walker, 154 N.C. App. 645, 651, 572 S.E.2d 866, 870 (2002) (finding sufficient evidence that life of victim was threatened or endangered where victim testified that defendant pinned victim to ground and pointed gun at victim's back and head). Thus the trial court properly denied defendant's motion to dismiss the charge of robbery with a firearm. Finding no error, we uphold defendant's convictions.
No Error.
Judges CALABRIA and GEER concur.
Report per Rule 30(e).
NOTES
[1] Defendant also assigns error to the admission of the paper bag containing the rifle magazine. On appeal, however, defendant fails to make any specific argument in his brief regarding its relevance. Defendant has, therefore, abandoned his challenge to its admission at trial. N.C.R. App. P. 28(b)(6).