STATE OF NORTH CAROLINA v. FRED JULIUS COLE, JR.

No. 4

(Filed 11 October 1977)

1. **Criminal Law § 75.8— Miranda warnings in Georgia—repetition not necessary upon interrogation in Fayetteville**

    It was not necessary for officers to repeat *Miranda* warnings and have defendant execute a waiver of rights when he was questioned in Fayetteville some seven hours after he had been given the *Miranda* warnings in Georgia and had signed a waiver of rights form in that state where the same officer gave the initial warnings and conducted the subsequent interrogation; defendant signed a consent to be questioned form in Georgia but stated that he did not want to be questioned in Georgia and that he would make a statement when he returned to Fayetteville; defendant was advised prior to the interrogation in Fayetteville that he was still covered by his constitutional rights as originally explained to him in Georgia, and defendant acknowledged the earlier waiver of rights by stating that he would live up to his agreement to make a statement; nothing in the record indicates that defendant was so emotionally unstable or intellectually deficient that he had forgotten his constitutional rights as explained to him in Georgia; and nothing in the record indicates that anything occurred in the interval between the warnings in Georgia and the interrogation in Fayetteville to dilute the initial warnings.

2. **Criminal Law § 75— transcription of defendant's oral statements—failure to sign before request for counsel**

    Defendant's oral statements, made and transcribed prior to any violation of his constitutional rights, were not rendered inadmissible merely because he failed to sign them until after he asked for an attorney.

3. **Constitutional Law § 45— assistance of counsel—right to conduct own defense**

    A criminal defendant is entitled to the assistance of competent counsel in the preparation and conduct of his defense; however, a defendant is constitutionally guaranteed the right to carry out his own defense without an attorney when he voluntarily and intelligently elects to do so.

4. **Constitutional Law §§ 45, 46— motion to dismiss appointed counsel—advice of right to conduct own defense**

    The trial court did not err in denying defendant's motion during trial that his court-appointed attorney be dismissed without advising defendant of his right to conduct his own defense, although it is the better practice for the court to inquire of defendant whether he wishes to conduct his own defense.

DEFENDANT appeals pursuant to G.S. 7A-27(a) from judgments of *Bailey, J.*, 1 November 1976 Session, WAKE County Superior Court. On indictments proper in form, defendant was charged with and convicted of murder in the first degree, armed robbery, and assault with a deadly weapon with intent to kill inflicting serious bodily injury. Defendant's conviction of assault with a deadly

weapon with intent to kill inflicting serious bodily injury was certified for review pursuant to G.S. 7A-31(a).

Defendant was sentenced to life imprisonment on the first degree murder conviction, and to twenty years, to run consecutively with the life sentence, on the assault with a deadly weapon conviction. The court did not pass judgment on the robbery with a firearm verdict, presumably because it merged with the first degree murder conviction.

The evidence for the State tended to show the following: Lester Bulla, a black man, was killed in the course of a robbery on 21 February 1976 at the Colonial Ice House, where he was employed, in Fayetteville, North Carolina. In the commission of the robbery, defendant, carrying a sawed-off shotgun and accompanied by his brother, entered the Ice House and demanded money. When one of the employees, Earl McMillian, another black man, turned to get money for the robbers, he was shot in the back. As McMillian lay on the floor, he heard the deceased say that they did not have to shoot him, that he would get the money for them. McMillian last saw the deceased alive at the cash register. He then heard a shot and all was quiet. McMillian later described the robbers as two black men, one tall and one short. Defendant was six feet tall and his brother was five feet five inches.

During the police investigation, it was determined that the cash register had a reading of $378.75 on it. Twelve dollars and sixty cents in loose change and eleven dollars in currency was found on the floor at the scene.

Sometime between 9:30 and 10:00 on the evening of the crime, defendant went to the home of his sister, Martha Jones, who lived near the Ice House. He sought unsuccessfully to call a cab and then left. The next day Martha's husband found a sawed-off shotgun under a shed in the backyard of their home. This gun was later turned over to the police and identified as the one used in the robbery and killing at the Ice House.

On 3 March 1976 defendant and his brother were apprehended in Richmond County, Georgia. The next day, Officer Cook, Sergeant House and SBI Agent Parker were dispatched to Georgia to return the suspects to Cumberland County in North Carolina.

The officers talked to defendant in Georgia about 1:00 p.m. that day. At that time defendant was fully advised of his *Miranda* rights and stated that he understood each of the rights explained to him

and signed a warning and advice of rights form. The second half of this form contained a "consent to be questioned," which was read to defendant. He stated that he understood its meaning, but did not want to be questioned in Georgia. He further said that he would make a statement when he returned to Fayetteville, whereupon he signed the consent to be questioned form, on which a notation was made that defendant "refused to be questioned." No interrogation was made of defendant in Georgia.

The officers left Richmond County at approximately 2:30 p.m. that day and arrived in Fayetteville about 7:30 p.m. Upon arrival, defendant was taken immediately to a squad room in the Law Enforcement Center.

Shortly thereafter, Sergeant House asked defendant whether he was going to live up to his agreement to make a statement, since Sergeant House had lived up to his by not questioning defendant in Georgia. Sergeant House advised defendant he was still covered by his constitutional rights as read to him and signed in Georgia. Defendant then stated that he understood his rights and wanted to make a statement. At this point, defendant proceeded to make incriminating and inculpatory statements relative to the charges against him. As defendant made these statements, Sergeant House took them down in longhand and passed them out to Sergeant Conerly, who in turn typed them.

The questioning continued until approximately 9:00 p.m. About this time, defendant's brother saw Mr. James D. Little, the Public Defender, who asked whether defendant's brother wanted a lawyer. Defendant's brother responded that he did not, but indicated that defendant wanted to see Little.

At approximately 9:20 p.m., Little went to the squad room where he was informed that defendant was in the interview room making statements to Sergeant House. Little asked to see Sergeant House immediately. At this time, defendant had already made an inculpatory statement. He had not asked to see a lawyer, nor had he requested to use the telephone or indicated that he wished to stop talking.

Little asked to see defendant in order to determine whether he was indigent and wanted counsel. Sergeant House refused and informed Little that he would call the District Attorney, Edward Grannis, and subsequently did so. Meanwhile, no questioning took place. Defendant later told SBI Agent Parker that he wanted to see

Little and still later said that he was tired and did not want to answer any more questions.

About 10:20 p.m., District Attorney Grannis arrived. He told the officers to advise defendant of his rights again and this was done at 10:26 p.m. Defendant signed the warning and advice of rights form. After he read the "consent to be questioned" form, defendant was told that if he signed it he would not be permitted to see Little. Defendant hesitated momentarily and then signed it at 10:30 p.m. District Attorney Grannis informed Little that he would not be allowed to see defendant, and the officers continued the interview.

At a suppression hearing before Judge Giles Clark, the portion of the confession given by defendant prior to 9:30 p.m. was found to be "part of the same transaction in which he was advised of his rights in Richmond County, Georgia, and that the consent of the defendant to waive his rights was a part of the same transaction and related back to the waiver and consent which he had made in Richmond County, Georgia ..." The portion of the confession made after defendant requested to see Public Defender Little and after defendant indicated that he did not want to continue was ruled inadmissible. At trial, the portion of the confession taken from defendant before 9:30 p.m. was admitted into evidence over the objection of counsel.

In addition, the State presented substantial direct and circumstantial evidence implicating defendant in the robbery and murder.

The defendant presented no evidence.

Other facts necessary to the decision are set out in the opinion.

*Attorney General Rufus L. Edmisten by Assistant Attorney General Roy A. Giles, Jr. for the State.*

*Joseph B. Cheshire, V and William J. Bruckel, Jr., for the defendant.*

COPELAND, Justice.

This case presents two questions for our consideration:

(1) Did the trial court commit error in admitting the signed statement of the defendant into evidence? (2) Did the trial court commit error in denying defendant's motion to dismiss his court-appointed counsel?

For the reasons outlined below, it is our decision that no error was committed by the trial court in either instance.

[1]   Defendant contends that the confession made by him before 9:30 p.m. on 4 March 1976 should not have been received into evidence. Relying on *State v. White*, 288 N.C. 44, 215 S.E. 2d 557 (1975), defendant argues that his refusal to make a statement in Georgia rendered the waiver signed by him at that time a nullity. He further argues that under the standard applied in *White* the interrogation that occurred in Fayetteville, North Carolina, was not a part of the same transaction in which he was advised of his rights in Georgia; therefore, it is asserted that it was necessary for the investigating officers to repeat the warnings under *Miranda v. Arizona*, 384 U.S. 436, 16 L.Ed. 2d 694, 86 S.Ct. 1602 (1966), and have waivers executed again upon defendant's return to Fayetteville.

Chief Justice Sharp, speaking for our Court in *State v. McZorn*, 288 N.C. 417, 219 S.E. 2d 201 (1975), said:

> "[A]lthough Miranda warnings, once given, are not to be accorded 'unlimited efficacy or perpetuity,' where no inordinate time elapses between the interrogations, the subject matter of the questioning remains the same, and there is no evidence that in the interval between the two interrogations anything occurred to dilute the first warning, repetition of the warnings is not required. However, the need for a second warning is to be determined by the 'totality of the circumstances' in each case. '[T]he ultimate question is: Did the defendant, with full knowledge of his legal rights, knowingly and intentionally relinquish them?' " 288 N.C. at 433-434, 219 S.E. 2d, at 212. (Citations omitted.)

Thus, we must determine whether the original warnings had become so stale and remote that defendant had lost sight of his constitutional rights. In deciding this, we must consider the following circumstances:

> "(1) the length of time between the giving of the first warnings and the subsequent interrogation; (2) whether the warnings and the subsequent interrogation were given in the same or different places; (3) whether the warnings were given and the subsequent interrogation conducted by the same or different officers; (4) the extent to which the subsequent statement differed from any previous statements; (5) the apparent intellectual and emotional state of the suspect.' " *State v. McZorn, supra*, at 434, 219 S.E. 2d, at 212. (Citations omitted.)

In the instant case there was at most an interval of seven hours between the first warnings given in Georgia and the subsequent interrogation in Fayetteville. The same officer gave the initial warnings and conducted the subsequent interrogation. The confession was not inconsistent with any previous statements by defendant, since he refused to be questioned at the initial interview in Georgia. There was nothing in the record to indicate that defendant was so emotionally unstable or intellectually deficient that he had forgotten his constitutional rights which had been fully explained to him a few hours earlier.

Other jurisdictions have held intervals of seven to twelve hours to be insufficient to require repeated warnings. *See, Watson v. State*, 227 Ga. 698, 182 S.E. 2d 446 (1971); *State v. Gilreath*, 107 Ariz. 318, 487 P. 2d 385 (1971) (applying *Escobedo* principles). We find nothing in the record to indicate that anything occurred in the interval between the warnings in Georgia and the later interrogation in Fayetteville to dilute the initial warnings. Further, defendant was advised prior to the questioning in Fayetteville that he was still covered by his constitutional rights as originally read to him in Georgia. At this time, defendant stated that he understood these rights and wanted to make a statement. Thus we find that the mere separation of time and distance between the first warnings and the subsequent questioning at which defendant made inculpatory statements was insufficient to support a holding that, under the totality of the circumstances, the warnings had become so stale and remote that there was a substantial possibility that defendant was unaware of his constitutional rights at the time he confessed.

Moreover, defendant's reliance on *State v. White, supra*, is misplaced since the case *sub judice* is clearly distinguishable. In *White*, the defendant was arrested in New Jersey and made a confession to police officers while being transported to North Carolina by automobile. Prior to the confession, he was fully advised of his *Miranda* rights and expressly waived them. Later, while the defendant was in custody in Laurinburg, North Carolina, he was again given full *Miranda* warnings, after which he was placed in a room with his girl friend, who proceeded to make a statement implicating him in the crime in question. After the statement was made, the police officers asked the defendant if he disagreed with anything the girl said. He responded that he did not, that she had told the truth.

We held that the second statement should have been suppressed because, "[T]here was neither evidence nor finding by the trial judge that defendant waived his right to remain silent or his

right to have counsel present during this particular in-custody interrogation." *State v. White, supra,* at 52, 215 S.E. 2d, at 562. We further held that the State was not entitled to rely upon defendant's earlier waiver in New Jersey because, "His confession after waiver at that time 'exhausted the procedure' to which the waiver applied." *Id.*, at 52-53, 215 S.E. 2d, at 562.

However, in the instant case there was no confession after the waiver in Georgia which "exhausted the procedure" to which the waiver applied. In addition, the record clearly discloses that defendant intended the waiver signed in Georgia to apply to the interrogation in Fayetteville. When he signed the waiver, defendant indicated that he did not want to make a statement at that time, explaining that he wanted to wait until he got to Fayetteville.

Thus, there was a direct connection between the waiver in Georgia and the statement made in Fayetteville. When back in North Carolina, defendant acknowledged the earlier waiver by saying that he would live up to his agreement to make a statement. This was done after defendant had been advised that he was still entitled to the same rights explained to him in Georgia, at which point he stated that he understood those rights and wanted to make a statement.

[2] Further, because he did not sign the written statement until after 9:30 p.m., defendant asserts that the trial court erred in permitting a portion of it to be read into evidence. It is argued that since defendant did not sign or acknowledge the correctness of the statement until after he had requested to see the Public Defender, the entire writing was inadmissible.

Defendant relies heavily on *State v. Walker,* 269 N.C. 135, 152 S.E. 2d 133 (1967), in which our Court held that a written statement which was an interpretative narration of defendant's confession and was signed by defendant without being read by or to him, was inadmissible. We find *Walker* is not controlling, for as was pointed out in that case, "There is a sharp difference between reading from a transcript which, according to sworn testimony, records the exact words used by an accused, and reading a memorandum that purports to be an interpretative narration of what the officer understood to be the purport of statements made by the accused." *Id.*, at 141, 152 S.E. 2d, at 138.

In the instant case, the statement in question was taken down in longhand in defendant's own words by Sergeant House and typed by Sergeant Conerly. It was not merely the officers' impressions of

the import of defendant's statements. " '[T]here is no requirement that an oral confession be reduced to writing or that the oral statement, after transcription by another, be signed by the accused.' " *State v. Fox*, 277 N.C. 1, 25, 175 S.E. 2d 561, 576 (1970). In the case *sub judice*, the initial recordation of defendant's words was done by means of the officer's longhand transcription, rather than by tape recorder, as in *State v. Fox, supra*. This is an insufficient distinction on which to bar admission of the statement where, as here, there is sworn testimony that these were the actual words of the accused.

Thus, defendant's oral statements, made and transcribed prior to any violation of his constitutional rights, were not rendered inadmissible merely because he failed to sign them until after he asked for an attorney. This assignment of error is overruled.

Defendant also assigns as error the denial of his motion that his court-appointed counsel be dismissed. A *voir dire* hearing was conducted on defendant's motion during the trial. At this hearing the court determined that defendant was adequately represented by counsel who, of the court's personal knowledge, was competent to defend him. Consequently, the court refused to replace defendant's counsel.

[3]  A criminal defendant is entitled to the assistance of competent counsel in the preparation and conduct of his defense. *Gideon v. Wainwright*, 372 U.S. 335, 9 L.Ed. 2d 799, 83 S.Ct. 792 (1963). However, a defendant is constitutionally guaranteed the right to carry out his own defense without an attorney when he voluntarily and intelligently elects to do so. *Faretta v. California*, 422 U.S. 806, 45 L.Ed. 2d 562, 95 S.Ct. 2525 (1975); *State v. McNeil*, 263 N.C. 260, 139 S.E. 2d 667 (1965).

[4]  Defendant contends that the trial court erred in failing to advise him of his right to conduct his own defense before denying his motion to withdraw defense counsel. The United States Supreme Court in *Faretta* did not speak to this question since the defendant there had requested well before trial that he be permitted to represent himself. In the case under consideration, defendant did not seek to have his counsel removed until the trial was well under way and at no time indicated a desire to represent himself.

Nonetheless, defendant argues that *State v. Robinson*, 290 N.C. 56, 224 S.E. 2d 174 (1976), required the trial court to advise defendant of his right to proceed without counsel upon denial of his motion to replace his attorney. *Robinson*, however, involved a situation in which the court, after denial of a motion to withdraw, allowed

defense counsel to limit his examination of a defense witness and permitted defendant to conduct portions of the examination. This was done to permit defense counsel to avoid eliciting what he believed to be perjury from this witness. We held that this appearance of less than vigorous advocacy by defendant's counsel implied to the jury that defendant and his attorney were at odds and was so prejudicial as to require reversal. While defendant in the case under consideration did complain at *voir dire* of his attorney's advice to potential witnesses to tell the truth, whatever it might be, counsel here continued to be a vigorous advocate for defendant and in no way exhibited a lack of zeal to the jury.

We find no merit in this assignment of error. Still, we wish to reiterate that, as we said in *State v. Sweezy*, 291 N.C. 366, 230 S.E. 2d 524 (1976), it is the better practice for the court to inquire of defendant whether he wishes to conduct his own defense. *See also, State v. McNeil, supra.*

The defendant has had a fair trial and we find

No error.