STATE OF NORTH CAROLINA v. DOUG GERALD

No. 33

(Filed 1 December 1981)

1. **Constitutional Law § 45— indication of problem with counsel— no requirement of formal hearing**

    It was not error for the trial judge to fail to conduct a hearing in accordance with G.S. 15A-1242 to determine whether defendant wished to represent himself after defendant stated to the court that he did not want a lawyer. Defendant's exchange with the trial judge indicated that he was confused by the technicalities of the jury voir dire and that he simply wanted to have the court go ahead and get it over with. There was no intimation that he was considering waiving his constitutional right to counsel in conducting his own defense. Had defendant clearly indicated a desire to have counsel removed and proceed *pro se*, then the trial judge should have made further inquiry pursuant to G.S. 15A-1242.

2. **Criminal Law § 112.7— insanity defense—instructions proper**

    Defendant's contention that the trial court's references to the defense of insanity during the instructions to the jury on the elements of second degree murder and voluntary manslaughter were prejudicially complicated was without merit. The court properly charged the jury on the defense of insanity as a separate issue for their consideration and correctly charged as to the defendant's burden in proving the affirmative defense of insanity and the State's burden of proof concerning the offenses charged.

3. **Homicide § 30.3— failure to instruct on involuntary manslaughter proper**

    Defendant's statement that he thought the victim was reaching under the seat of a truck for a gun and "then the gun went off," when taken in context with his other testimony, including a statement that "when I pulled the trigger on the shotgun, he went down," and when taken in context with a written statement to the police on the night of the shooting in which defendant admitted that he pulled the trigger and shot the victim in the head, was insufficient evidence to raise an inference that the shooting was unintentional. Therefore, it was not error for the trial court to fail to instruct the jury on the offense of involuntary manslaughter.

4. **Criminal Law § 6— failure to charge on defense of voluntary intoxication proper**

    In a prosecution for second degree murder, defendant's evidence that on the evening of the shooting he drank a cup of rum and two cups of wine, that he usually did not drink because his doctor had told him, after an operation on his head, not to drink any liquor because it affects his mind, that one witness testified his mind was "coming and going," and that he heard "all kinds of things, noise" and "flipped out" was insufficient evidence of intoxication to require the trial judge to instruct the jury on the defense of voluntary intoxication.

APPEAL by defendant from judgments of *Battle, J.,* entered at the 1 December 1980 Criminal Session of ROBESON Superior Court.

Upon pleas of not guilty, defendant was tried on bills of indictment charging him with first-degree murder and assault with a deadly weapon with intent to kill inflicting serious bodily injury. At trial, the state announced that in the murder case it would seek no greater verdict than second-degree murder.

The state presented evidence tending to show:

On the afternoon of 20 June 1980, a number of persons were gathered at the home of Mary Magdalen McLean, located in the Barker-Ten Mile area near Lumberton, for the purpose of socializing and drinking beer. Among the friends and relatives present were defendant, Doug Gerald, and his girlfriend, Billy Jean Locklear. During the course of that afternoon and evening defendant quarrelled with several persons, and scuffled with Ms. McLean's cousin, a soldier from New Jersey; someone intervened, however, and no blows were exchanged. After this, defendant decided to go home but Billy Jean refused to return with him. Defendant began "fussing" at her and Marvin Snow told him to leave her alone. Defendant told Snow to mind his own business, then announced that he was going home to get his gun and would be back.

Defendant had been drinking that afternoon. His own testimony disclosed that he had drunk some rum and two cupfuls of wine and sweet soda. However, there was no evidence that defendant was drunk and several persons testified to that effect.

After defendant left to get his gun, the rest of the group, sensing trouble, decided to leave and go to Ernest McLean's house. They all, except Snow, left in one car and he was to follow in his pickup truck.

As Snow was climbing into his truck, Pam Bennett drove up and walked over to chat with him. At this point defendant returned carrying a shotgun. Defendant approached Snow, who was sitting in the truck, and said "Didn't I tell you to leave earlier?" Snow said nothing. As he spoke defendant raised the shotgun. He shot Snow with the barrel of the gun only a foot and half from Snow's head. The deceased's brains were literally blown

out and he died instantly. Pam Bennett, who had been standing on the other side of the truck, was the only eyewitness. When defendant shot Snow, she ran across the street to a neighboring house for help. Defendant followed. As Ms. Bennett reached the porch and began knocking on the door, she turned and saw defendant coming toward her. She begged him not to shoot her. When he was about eight feet away, she turned and started to run toward a tobacco field. Defendant fired the shotgun, hitting her in her back and arm. Ms. Bennett was hospitalized for almost two weeks as a result of her injuries.

After shooting Ms. Bennett, defendant left the scene. He was arrested three hours later walking down a road with the shotgun over his shoulder.

At the scene of the arrest, after being advised of his *Miranda* rights, defendant told police that he figured Snow was dead because he meant to blow his brains out, but that he really didn't know why he shot the girl. Shortly thereafter, in a written statement taken at the sheriff's department, defendant stated: "I am not drunk . . . I knew what I was doing then and I know what I'm doing now. I'm not sorry for killing Marvin Snow. I'm sorry I shot the girl. I hate I missed getting Elizah and I hate I missed getting the soldier dude for pushing me."

Defendant presented evidence tending to show:

In 1969 defendant received a head injury in an automobile accident and had suffered with mental illness since then. Both his sister and mother testified with respect to his mental problems. They stated he had been hospitalized because of them several times, and that sometimes he would act strange and "talk frenzies."

On the night of 20 June 1980 he had quarrelled with several persons at the party and had a fight with a soldier. His mind at that time was "coming and going." Defendant also disputed the written statement he had given the police.

The jury returned guilty verdicts on both charges. Defendant was sentenced to life imprisonment on the second-degree murder conviction and 15 to 20 years on the assault conviction, sentences to run concurrently.

Defendant appealed from both judgments. Pursuant to G.S. 7A-31(a) we allowed defendant's motion to bypass the Court of Appeals in the assault with intent to kill case.

*Attorney General Rufus L. Edmisten, by Associate Attorney Elaine J. Guth, for the state.*

*Adam Stein, Appellate Defender, and Marc D. Towler, Assistant Appellate Defender, for the defendant.*

BRITT, Justice.

[1] By his first assignment of error, defendant contends that the trial judge erred in failing to conduct a hearing to determine whether defendant wished to represent himself after defendant stated to the court that he did not want a lawyer.

This alleged error arose out of an incident that occurred during jury selection in which defendant spontaneously began to address the court. The trial judge immediately dismissed the prospective jurors from the courtroom and proceeded to inquire as to what was troubling defendant. The following exchange ensued.

DEFENDANT GERALD: Your Honor, sir, excuse me, sir. I don't mean no harm. I try to give respect to everyone in the Courthouse.

Judge, Your Honor, sir, I don't know what's happening, but I would like to say this much, Judge, Your Honor—

THE COURT: Well, this is not the time for that. I will listen to what you want to say in just a little while.

MR. WEBSTER: Could Mr. Chavis and I approach the Bench, Your Honor?

THE COURT: Yes, Just sit down a little while.

(Discussion at Bench between Court and Counsel.)

THE COURT: All right. Members of the Jury, I'm going to ask you to step back in to the jury room for just a moment, please. Right back here.

And, Members of the Jury, out in the audience, I'm going to have to ask you to step out in the hall for just a moment, please. The Sheriff will let you know when to come back in.

(The following was had outside the presence of all jurors.)

THE COURT: All right. Mr. Gerald, what is it you wanted to say?

DEFENDANT GERALD: Sir, I don't mean no harm, sir.

THE COURT: Right.

DEFENDANT GERALD: Lots of times, I don't even know what I'm doing or saying, but, sir, I don't even want no more lawyer. I don't want no lawyer. I don't need no lawyer. I just rather for it to be like it is. I rather it be like it is. The Jury come on in and whatever, or whatever, and then in the jailhouse, it's running me crazy, sir. I don't know, but I rather for it to be like it is. I don't want no lawyer.

THE COURT: Well, you understand that right now we are just in the process of picking a jury, and your lawyer is doing the best he can.

DEFENDANT GERALD: Sir, it's running me crazy in here, sir. It's running me crazy, making me dizzy and drunk in the head.

THE COURT: What is?

DEFENDANT GERALD: Sitting in here waiting and worrying.

THE COURT: Well, I can appreciate the waiting and worrying, but we are now getting started in the trial, and it will be over pretty soon, now.

Any particular reason why you say you don't want a lawyer?

DEFENDANT GERALD: Sir, I have all kind hallucinations in my head.

THE COURT: What kind of —

DEFENDANT GERALD: My mind all fill up with Jesus Christ and all of the hallucinations in my mind. I don't want no lawyer. I just rather do what you going to do, and do whatever —

THE COURT: Well, Mr. Chavis has been appointed to represent you, and has been representing you for some time, and I'm sure he'll do a good job for you, and certainly, I believe you would be much better off having a lawyer, so don't you think we ought to just go ahead and proceed with the trial as we are?

DEFENDANT GERALD: Sir, I don't know what to think. I don't understand. I'm trying to understand the lawyer and what he's saying, but I don't even understand what he's talking about. All the people over there, while ago, all that, then he took them down. Might as well get it over with.

THE COURT: Well, we are just about to do that. See, he has a right to excuse as many as six jurors, just as the lawyer for the State does, so he's just trying to get a jury that he thinks would be the best for you. He's trying to look after you.

You understand that, don't you?

DEFENDANT GERALD: I believe I do, sir.

THE COURT: All right. You ready to go ahead? You want us to go ahead, now, with the trial?

DEFENDANT GERALD: Yes, sir. Yes, sir.

THE COURT: All right. Bring the jury back in.

DEFENDANT'S EXCEPTION NO. 1

A criminal defendant has a constitutional right to the assistance of competent counsel in his defense. *Gideon v. Wainwright*, 372 U.S. 335 (1963). Implicit in defendant's constitutional right to counsel is the right to refuse the assistance of counsel and conduct his own defense. *Faretta v. California*, 422 U.S. 806 (1975). In its decisions both prior to and after *Faretta*, this court has held that counsel may not be forced on an unwilling defendant. *State v. Thacker*, 301 N.C. 348, 271 S.E. 2d 252 (1980); *State v. McNeil*, 263 N.C. 260, 139 S.E. 2d 667 (1965).

Defendant asserts that the statements he made to the trial court constituted an unequivocal assertion that he wished to represent himself; and that in order to safeguard his constitu-

State v. Gerald

tional right to proceed *pro se* it was mandatory that the trial court advise him that he had the right to represent himself and to ascertain whether he desired to do so by following the procedures outlined in G.S. 15A-1242.

G.S. 15A-1242[1] sets forth the prerequisites necessary before a defendant may waive his right to counsel and elect to represent himself at trial. Defendant insists that decisions of this court support his arguments for a mandatory formal inquiry. We do not agree.

In *State v. Sweezy,* 291 N.C. 366, 230 S.E. 2d 524 (1976), defendant sought to have his appointed counsel dismissed and two black attorneys appointed to replace him. He never requested that he be allowed to represent himself. Defendant's motion was denied. We found no error but stated that "It would have been the better practice to have excused the jury and allowed the defendant to state his reasons for desiring other counsel. If no good reason was shown requiring the removal of counsel, then the court should have determined whether defendant actually desired to conduct his own defense." 291 N.C. at 372. In *State v. Gray,* 292 N.C. 270, 233 S.E. 2d 905 (1977), defendant assigned as error the trial court's denial of his motion to dismiss his court appointed attorney. Referring to Sweezy, *supra,* the court said: "Since there was no intimation that defendant Sweezy wished to represent himself, but only that he wanted 'two black lawyers,' and since '[d]efendant's courtroom behavior gave the trial judge every right "to suspect the bona fides of the defendant",' *Id.* at 373, 230 S.E. 2d at 529, there was no reversible error in the court's failure to follow the recommended procedure." 292 N.C. at 280. The court in *Gray* found no error, and commented that there was "not a scintilla of evidence" that defendant wished to represent himself. 292 N.C. at 281.

---

1. *Defendant's election to represent himself at trial.* — A defendant may be permitted at his election to proceed in the trial of his case without the assistance of counsel only after the trial judge makes thorough inquiry and is satisfied that the defendant:

   (1) Has been clearly advised of his right to the assistance of counsel, including his right to the assignment of counsel when he is so entitled;

   (2) Understands and appreciates the consequences of this decision, and

   (3) Comprehends the nature of the charges and proceedings and the range of permissible punishments.

In *State v. Cole*, 293 N.C. 328, 237 S.E. 2d 814 (1977), defendant's motion to dismiss court appointed counsel was denied and the trial judge consequently refused to replace defendant's counsel. Defendant contended that the trial court erred in failing to advise him of his right to conduct his own defense before denying the motion. The court found that at no time had the defendant indicated a desire to represent himself, therefore, there was no merit to his assignment of error. The court did reiterate, however, that it is the better practice for the court to inquire of defendant whether he wishes to conduct his own defense.

These holdings clearly indicate that although the better practice when a defendant indicates problems with his counsel is for the court to inquire whether defendant wishes to conduct his own defense, it is not reversible error for the court not to do so when there has been no intimation that defendant desired to represent himself. Each case, therefore, must be considered on its own merits.

In the present case the record shows that defendant was 26 years old with the equivalent of a third grade reading and comprehension level and an I.Q. of 65; that he functions within a range of mild mental retardation; and that he has a history of mental illness which includes auditory hallucinations. The reasonable interpretation of defendant's exchange with the trial judge is that he was confused by the technicalities of the jury voir dire, that he knew he was being tried for murder and the waiting in the jail and courtroom was making him dizzy with worry. It appears that he simply wanted to have the court go ahead and get it over with. There was no intimation, and it is beyond reasonable belief, that this defendant was in any way considering waiving his constitutional right to counsel and conducting his own defense.

It is true that the issue is not whether the defendant has the skill and training to represent himself adequately but whether the defendant is able to understand the consequences of waiving court appointed counsel and representing himself. *Faretta v. California, supra; State v. Brooks*, 49 N.C. App. 14, 270 S.E. 2d 592 (1980). "[T]he waiver of counsel, like the waiver of all constitutional rights, must be knowing and voluntary, and the record must show that the defendant was literate and competent, that he

understood the consequences of his waiver, and that, in waiving his right, he was voluntarily exercising his own free will. (Citation omitted.)" 301 N.C. at 354.

It is overwhelmingly apparent on the facts of this case that defendant could not have been allowed to take over his own defense, nor had he knowingly and intelligently indicated a desire to do so. Nevertheless, defendant would have us adopt the requirement of a formal hearing in accordance with G.S. 15A-1242 whenever a defendant indicates to the trial court a problem with his counsel. We decline to adopt such a stringent standard. When defendant expresses to the trial court that there is a problem with his counsel, the trial court should conduct an inquiry out of the presence of the jury to determine the nature of the problem. The extent of the inquiry should be as necessitated by the circumstances. If defendant clearly indicates a desire to have counsel removed and proceed *pro se*, then the trial judge should make further inquiry; he should advise defendant of his right to represent himself, and determine whether defendant understands the consequences of his decision and voluntarily and intelligently wishes to waive his rights. We have held and reaffirm that an inquiry conducted pursuant to G.S. 15A-1242 fully satisfies the constitutional requirement that waiver of counsel must be knowing and voluntary. *State v. Thacker, supra.*

In the case at bar the trial judge did make an inquiry, out of the presence of the jury, to determine the nature of defendant's problem. He then proceeded to assuage defendant's anxiety and reassure him that his counsel was representing him well. On the facts of this case, no further inquiry was necessary. None of the factors that would trigger a hearing in accord with G.S. 15A-1242 were present. Defendant's assignment, therefore, is without merit.

[2] Defendant's second assignment of error concerns the trial court's references to the defense of insanity during the instructions to the jury on the elements of second-degree murder and voluntary manslaughter. He contends that such references prejudicially complicated the instructions and confused the jury as to the state's burden of proof on the elements, in violation of defendant's due process rights. This assignment has no merit.

The rule in North Carolina is that insanity is an affirmative defense and, therefore, the burden of proving insanity is on the defendant. The burden of proof on a defendant is that he must establish his insanity at the time of the alleged crime to the satisfaction of the jury. *State v. Harris*, 290 N.C. 718, 228 S.E. 2d 424 (1976).

In the case at bar, the court in its general instructions properly charged the jury on the defense of insanity as a separate issue for jury consideration. The court correctly charged that insanity was a complete defense and that defendant had the burden of proving to the jury's satisfaction that he was insane at the time of the shootings. The court also firmly impressed on the jurors that the state's burden of proof was to prove every element of the offense charged beyond a reasonable doubt. The court made clear the distinction between the state's burden of proof on the elements and defendant's burden of proof on the affirmative defense of insanity.

[3]   By his next assignment of error, defendant contends that the trial court erred by failing to instruct the jury on the lesser included offense of involuntary manslaughter.[2] This assignment has no merit.

It is well-established that a trial court must instruct on a lesser included offense of the crime charged where there is evidence from which the jury could infer that the defendant had committed the lesser offense. *State v. Redfern*, 291 N.C. 319, 230 S.E. 2d 152 (1976). However, when all the evidence tends to show that defendant committed the crime charged and did not commit a lesser included offense, the court is correct in refusing to charge on the lesser included offense. *State v. Redfern, supra; State v. Duboise*, 279 N.C. 73, 181 S.E. 2d 393 (1971).

Involuntary manslaughter is the unlawful killing of a human being without malice, premeditation or deliberation and without the intent to kill or inflict bodily injury. *State v. Fleming*, 296 N.C. 559, 251 S.E. 2d 430 (1979); *State v. Wrenn*, 279 N.C. 676, 185 S.E. 2d 129 (1971).

---

2. The court submitted the murder charge on second-degree murder, voluntary manslaughter or not guilty.

The evidence which defendant contends supports an inference of involuntary manslaughter is his own in-court testimony that he thought Snow was reaching under the seat of the truck for a gun and "then the gun went off." Nowhere else in the record is there any evidence that would suggest that the shooting was accidental. In fact, later in his testimony, defendant made several statements which totally negate any inference that the shooting was unintentional. One of these statements was, "When I pulled the trigger on the shotgun, he went down . . . ." Defendant also gave a written statement to police on the night of the shooting, that was duly admitted into evidence, in which defendant admitted that he pulled the trigger and shot Snow in the head, and that he was not sorry for killing him.

We find that defendant's statement "then the gun went off" was insufficient evidence to raise an inference that the shooting was unintentional, especially when taken in context with the rest of his testimony. Defendant's assignment of error is therefore overruled.

[4]  By his last assignment of error defendant contends that the trial court failed to instruct the jury on the defense of voluntary intoxication as a defense to the charge of assault with a deadly weapon with intent to kill inflicting serious bodily injury. This assignment is without merit.

Voluntary intoxication is not a legal excuse for a criminal act; however, it may be sufficient in degree to prevent and therefore disprove the existence of a specific intent such as an intent to kill. *State v. Goodman*, 298 N.C. 1, 257 S.E. 2d 569 (1979). 4 Strong's N.C. Index, § 6. To make the defense of voluntary intoxication available to defendant, the evidence must show that at the time of the shooting the defendant's mind and reason were so completely intoxicated and overthrown that he could not form a specific intent to kill. *State v. McLaughlin*, 286 N.C. 597, 213 S.E. 2d 238 (1975); *State v. Cureton*, 218 N.C. 491, 11 S.E. 2d 469 (1940). In the absence of evidence of intoxication to a degree precluding the ability to form a specific intent to kill, the court is not required to charge the jury thereon. *State v. McLaughlin, supra.*

In the case at bar there was ample evidence that defendant had been drinking, but not to an extent that he was intoxicated or unable to reason. Ernest McLean, Jr. testified:

"We all drank a little beer and a little vodka. Douglas was drinking at the time but he hadn't had that much. He wasn't drunk."

Mary Magdalen McLean testified:

"I saw Doug Gerald drinking a little liquor but not much and some beer. He was drinking from a little cup."

Deputy Sheriff Sanderson testified:

"I could smell an odor of alcohol about Mr. Gerald's person. He was coherent and understood me. I asked him if he understood what I was saying. We also asked him how much he had had to drink, to which he responded that he had had two or three beers. He did not appear to be intoxicated at the time."

Detective Maynor testified:

"I could detect an odor of alcohol about the person of Lawrence Gerald. He walked and talked in a normal manner and in my opinion was definitely not drunk. He did not stagger and when he spoke his words were clear and sharp."

Defendant testified that on the evening of the shootings he drank a cup of rum and two cups of wine and sweet soda. He stated that he usually did not drink because his doctor had told him, after an operation on his head, not to drink any liquor because it affects his mind.

Defendant contends that this evidence, combined with evidence that on the evening in question after his arguments at Mary McLean's his mind was "coming and going", and that when he was leaving to go home he heard "all kinds of things, noise" and "flipped out", was sufficient evidence of intoxication to require the trial judge to instruct the jury on the defense of voluntary intoxication.

We do not agree. Defendant's evidence on his mental state was more appropriately relevant to the defense of insanity, on which the trial judge cautiously and thoroughly instructed the jury. The evidence in this case does not support a finding that defendant was intoxicated and the trial court did not err in failing to charge on the defense of voluntary intoxication.

We conclude that defendant had a fair trial, free from prejudicial error.

No error.