INMAN, Judge.
Defendant Dennis Ray Vines ("Defendant") appeals his convictions following jury verdicts finding him guilty of attempted first-degree forcible rape and first-degree forcible sexual offense. Defendant argues that the trial court erred in (1) denying his motion to dismiss the sexual offense charge because the State produced insufficient evidence that a taser was a dangerous weapon; and (2) refusing to instruct the jury on voluntary intoxication to negate the specific intent element of the attempted rape charge. After careful review of the record and applicable law, we hold that Defendant has failed to demonstrate error.
I. FACTUAL AND PROCEDURAL BACKGROUND
The evidence introduced at trial tended to show the following:
Beginning sometime in 2011, Defendant started a romantic relationship with Regina Thigpen ("Regina"). In 2016, Defendant was primarily living with Regina in her residence, along with two of her children, her eighteen-year-old daughter K.D. and her sixteen-year-old son R.M.[1] Defendant was part of Regina's nuclear family and had a close relationship with K.D., who considered him a father figure.
On the night of 14 September 2016, Defendant and Regina were at her residence. Occasionally, Regina and her sister would go out to play bingo, but Regina told her sister that she did not want to go that night for monetary reasons. Defendant, however, encouraged her to attend and offered her funds. This was "unusual" for Defendant, who normally "complain[ed]" and "ha[d] an attitude about [Regina] going to [b]ingo." When Regina did play bingo, she did not usually return home until about 2:00 a.m. to 3:00 a.m. the next morning. After Defendant gave Regina money to play, she and her sister then left the residence between 8:00 p.m. and 8:30 p.m.
After Regina left for bingo, K.D., who was still in high school, arrived home from her shift at a restaurant sometime before midnight. When K.D. arrived, Defendant was the only one in the house. K.D. did not stay long because she, with the permission of Defendant, went to her then-boyfriend's residence approximately five minutes away. Sometime later, K.D. returned home after Defendant called her saying it was getting late. Regina was still playing bingo and R.M. was not present when K.D. arrived back home. After Defendant and K.D. "laughed and joked" with one another upon her arrival, K.D. then went to her room, changed clothes, and fell asleep.
Later that night, K.D. was awakened by the sensation that she could not breathe and that she was being choked. When K.D. opened her eyes, she saw Defendant-who was holding a knife and a taser-on top of her, strangling her, and repeatedly telling her to "take them off." K.D. recognized the taser as the pink taser that she kept on her bedroom dresser. Defendant activated the taser twice "for it to flicker" during the altercation.
As Defendant continued to strangle K.D., she kicked him in the stomach, and the two fell off the bed onto the floor. Although K.D. continued to struggle, Defendant lifted her up by the neck and pulled down her pants and underwear. Defendant then ordered K.D. to walk toward Regina's bedroom, with the knife and taser pointed at her back. When they entered the bedroom, K.D. noticed that a pornographic video was playing on Defendant's phone, situated on a pillow. Once in the bedroom, Defendant pushed K.D. onto the bed and digitally penetrated her vagina. Defendant then forced K.D. to lie on her back. Defendant attempted to bind K.D.'s hands with duct tape, but stopped when she told him that "[she] would stop fighting" in response to Defendant's threat that he would kill her younger brother R.M. when he returned home. Defendant then attempted vaginal intercourse with K.D. but could not sustain an erection.[2]
Defendant eventually ceased his attempts at vaginal intercourse. K.D. noticed that Defendant was "act[ing] like he was talking to people in his head" and was "saying stuff like somebody else was there, like he was hearing voices," and told her to "go." K.D. promptly got off the bed, grabbed the knife and taser, and went into her room and closed the door. Defendant then "busted [K.D's] door open" before she could change clothes, begging for her forgiveness. Defendant proclaimed that his life was in K.D's hands, that he would not assault her again, and told her "it's not [him]. It's the drugs." Defendant repeated these pleas "[a]t least five or six times."
K.D. then sent a text message to Regina, who was still at bingo, and told her to come straight home. K.D. also sent a text message to her boyfriend reporting the assault and asking him to call Regina. Regina tried calling K.D. in response to her text, but got no answer. Regina then called K.D's boyfriend, who told her about Defendant's assault on K.D. Regina and her sister called the police and drove back to the house.
K.D.'s younger brother R.M. and his friend were first to arrive home after the assault, followed minutes later by Regina, her sister, and the police. Regina observed that Defendant, who was sitting on the couch in the living room, "was high" and "had been drinking" because she could smell the alcohol. Regina's sister also noticed that Defendant's eyes appeared "glassy." As K.D. told Regina and the officers what transpired, Defendant initially tried to repudiate her story, but soon fell silent and did not speak thereafter. After officers arrested Defendant, they discovered through a search of his person "a small bag of marijuana and [a] glass crack pipe."
On 3 April 2017, Defendant was indicted for first-degree forcible rape, first-degree kidnapping, assault by strangulation, and first-degree forcible sexual offense. The indictment for the sexual offense charge was later amended before trial to reflect the appropriate statutory title.[3]
While in prison awaiting trial, Defendant and Regina had three separate phone conversations. Among the topics discussed was Defendant's history with drugs and the implication of drugs being used on the night in question, which appear as follows:
[REGINA]: Let me say that I told you, you had problems within yourself, I told you, you needed help
[DEFENDANT]: Stand by me
[REGINA]: You didn't want it, you didn't want it. You wanted them drugs.
....
[REGINA]: [W]ould you want the charges dropped if it was your daughter? ...
[DEFENDANT]: If I knew that I loved them and they had, and I knew it was drug related.
[REGINA]: If you loved her that much then why did you do it?
[DEFENDANT]: If it was drug related and he didn't mean it[.]
....
[DEFENDANT]: I fucked up. I snapped out. I blanked out. My mind snapped and I got to pay for them [sic] consequences[.][4]
Defendant's cases came on for trial on 6 November 2017. At the close of the State's evidence, defense counsel moved to dismiss all the charges, and the trial court summarily denied the motion. Defendant did not present evidence.
At the charge conference, defense counsel requested that the trial court give the pattern jury instruction for voluntary intoxication, reasoning that the State introduced evidence regarding Defendant's intoxication at the time of the alleged offenses. The State objected, and the trial court denied the request.
The jury returned guilty verdicts for attempted first-degree forcible rape and first-degree forcible sexual offense.[5] The trial court sentenced Defendant to consecutive prison terms in the presumptive ranges of 238 to 346 and 365 to 498 months, with credit for 421 days spent in confinement.
Defendant gave oral notice of appeal.
II. ANALYSIS
A. Motion to Dismiss
Defendant first argues that the trial court erred in denying his motion to dismiss the first-degree forcible sexual offense charge because the State presented insufficient evidence that the taser was a dangerous weapon.
First-degree forcible sexual offense occurs, in relevant part, when a person performs a sexual act by force and against the victim's will, and employs or displays either "a dangerous or deadly weapon or an article which the [victim] reasonably believes to be a dangerous or deadly weapon." N.C. Gen. Stat. § 14-27.26(a) (2015) (emphasis added).[6] Based on the disjunctive "or" in the statutory language, a jury need only find that the defendant brandished a single weapon, one that either was a dangerous or deadly weapon or an item or object that the victim reasonably believed was a dangerous or deadly weapon. See Spruill v. Lake Phelps Volunteer Fire Dep't, Inc. , 351 N.C. 318, 324, 523 S.E.2d 672, 676 (2000) ("Where a statute contains two clauses which prescribe its applicability, and the clauses are connected by a disjunctive (e.g. 'or'), the application of the statute is not limited to cases falling within both clauses, but will apply to cases falling within either of them." (quotations and citation omitted)).
The pattern jury instruction comports with this statutory obligation and guides the trial court by providing that a defendant is guilty of first-degree forcible sexual offense by using a weapon if the jury finds that the defendant:
(A) [[employed] [displayed]
(1) [a dangerous or deadly weapon.] [ (Name weapon) is a dangerous or deadly weapon.] ....
(2) [an object that the alleged victim reasonably believed was a dangerous or deadly weapon. ... (In determining whether the particular object is a dangerous or deadly weapon, you should consider the nature of the object, the manner in which it was used, and the size and strength of the defendant as compared to the alleged victim.) ]]
N.C.P.I. Crim. 207.40B (2016). Thus, if both a dangerous or deadly weapon and an object that the victim reasonably believed was dangerous or deadly were used in furtherance of the crime, the trial court can instruct on both clauses.
Because Defendant employed a knife and a taser in the assault, his counsel agreed to the trial court instructing jurors on both items-the knife being a per se dangerous weapon and the taser being a dangerous weapon if the jury found it to be one. In its instruction to the jury, the trial court described the knife and the taser as agreed-upon in the charge conference:
So if you find from the evidence beyond a reasonable doubt that on or about the alleged date, the defendant engaged in a sexual act with the alleged victim and that the defendant did so by force and that this was sufficient to overcome any resistance the alleged victim might make and that the alleged victim did not consent and it was against the alleged victim's will and the defendant displayed a weapon and an object which were dangerous or deadly-which was a dangerous or deadly weapon , it would be your duty to return a verdict of guilty of first-degree forcible sexual offense.
(emphasis added). As emphasized above, in lieu of instructing on the disjunctive "or," the trial court erroneously used the conjunctive "and." When read plainly, the trial court instructed that the jury must find that Defendant used two dangerous or deadly weapons, i.e. , the knife and the taser, to commit first-degree forcible sexual offense, rather than merely the knife or the taser. See Lithium Corp. of Am. v. Town of Bessemer City , 261 N.C. 532, 535, 135 S.E.2d 574, 577 (1964) ("Ordinarily, when the conjunctive 'and' connects words, phrases or clauses of a statutory sentence, they are to be considered jointly." (citation omitted)). Because the instruction required an additional weapon element, Defendant argues that the State was required, and subsequently failed, to present sufficient evidence that the taser could be found to be a dangerous or deadly weapon.
Defendant relies on our Supreme Court's opinion in State v. Wilson , 345 N.C. 119, 478 S.E.2d 507 (1996), to support his assertion that "[t]he sufficiency of the evidence must be judged against the instructions given." Wilson held that the evidence to support a conviction can only be reviewed with "respect to the theory of guilt upon which the jury was instructed." Id. at 123, 478 S.E.2d at 510 (citing Presnell v. Georgia , 439 U.S. 14, 16, 58 L. Ed. 2d 207, 211 (1978) ). In other words, while there could be evidence in the record indicating culpability for more than one theory, the evidence supporting the conviction can only be reviewed according to the theory or theories on which the jury was instructed at trial.
Defendant's reliance on Wilson , and by extension the premise of his argument, is misplaced. Wilson concerned whether the State met its burden to prove each element of first-degree murder absent an instruction allowing jurors to find the defendant guilty under the principle of acting in concert. Id. Although there was evidence that the defendant acted in concert with others who killed the victim, absent a jury instruction on that theory, the State was required to prove that the defendant himself committed the murder. Id.
In this case, the theory of guilt for first-degree forcible sexual offense did not require the State to prove that Defendant employed two weapons rather than one. N.C. Gen. Stat. § 14-27.26.[7] Defendant misunderstands the law in arguing that an erroneous jury instruction can somehow affect the State's evidentiary burden to prove the commission of a crime beyond its necessary elements. Defendant cites to no legal authority, and we can find none, for the proposition that a crime's elements are dictated by a trial court's jury instruction rather than by law.
Also, because the trial court's flawed instruction made it more difficult for the jury to convict Defendant, the trial court's error was harmless. See State v. Dale , 245 N.C. App. 497, 506, 783 S.E.2d 222, 228 (2016) ("[A]s the State had to prove more than was required in order to obtain a conviction, there is no prejudice to [the] defendant.").
It was only necessary for the State to prove that Defendant employed or displayed either the knife or the taser. We need not address whether the State produced sufficient evidence regarding the taser because Defendant's counsel did not object to the trial court's conclusion that the knife was a dangerous or deadly weapon as a matter of law, and did not object to the jury instruction in that respect. See State v. Torain , 316 N.C. 111, 121, 340 S.E.2d 465, 472 (1986) (upholding a jury instruction stating that "a utility knife is a dangerous or deadly weapon"). As such, the trial court did not err in denying Defendant's motion to dismiss.
B. Voluntary Intoxication Instruction
Defendant next argues that the trial court erred in denying his counsel's request to instruct the jury on voluntary intoxication. Defendant asserts that there was evidence introduced by the State that he was intoxicated enough at the time of the alleged offense for the jury to reasonably conclude that he lacked the specific intent to commit attempted first-degree forcible rape.[8] We disagree.
To prove that a defendant attempted to commit first-degree forcible rape, the State must prove beyond a reasonable doubt that the defendant (1) "had the intent to have vaginal intercourse with the victim by force and against her will," State v. Nicholson , 99 N.C. App. 143, 145, 392 S.E.2d 748, 750 (1990), and (2) made "an overt act done for that purpose which goes beyond mere preparation but falls short of the completed offense." State v. Bell , 311 N.C. 131, 140, 316 S.E.2d 611, 616 (1984). "The intent element of attempted first-degree [forcible] rape is established if the defendant, at any time during the attempt, intended to gratify his passion upon the victim, notwithstanding any resistance on the victim's part." In re D.W. , 171 N.C. App. 496, 500, 615 S.E.2d 90, 93 (2005).
"Voluntary intoxication is not a legal excuse for a criminal act; however, it may be sufficient in degree to prevent and therefore disprove the existence of a specific intent." State v. Gerald , 304 N.C. 511, 521, 284 S.E.2d 312, 318 (1981). Although normally analyzed in the context of the premeditation and deliberation elements of first-degree murder, our courts have broadly held that voluntary intoxication may be a defense to a criminal charge requiring specific intent. State v. Merrill , 212 N.C. App. 502, 506-07, 713 S.E.2d 77, 80 (2011) (quoting State v. Cureton , 218 N.C. 491, 494, 11 S.E.2d 469, 470-71 (1940) ; State v. Bunn , 283 N.C. 444, 457, 196 S.E.2d 777, 786 (1973) ).
A voluntary intoxication instruction is warranted if the defendant:
[P]roduce[s] substantial evidence which would support a conclusion by the trial court that at the time of the crime for which he is being tried [the] defendant's mind and reason were so completely intoxicated and overthrown as to render him utterly incapable of forming [the requisite intent to commit the crime.] In the absence of some evidence of intoxication to such degree, the court is not required to charge the jury thereon.
State v. Keitt , 153 N.C. App. 671, 676-77, 571 S.E.2d 35, 39 (2002) (quoting State v. Kornegay , 149 N.C. App. 390, 395, 562 S.E.2d 541, 545 (2002) ). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." State v. Smith , 300 N.C. 71, 78-79, 265 S.E.2d 164, 169 (1980). "[C]ourts must consider the evidence in the light most favorable to the defendant." State v. Mash , 323 N.C. 339, 348, 372 S.E.2d 532, 537 (1988). Here, although Defendant did not produce any evidence at trial, he can "rely[ ] on the evidence produced by the [S]tate" to try and meet his burden. State v. Herring , 338 N.C. 271, 275, 449 S.E.2d 183, 186 (1994).
Defendant relies on Keitt and Mash to support his contention that he was entitled to a voluntary intoxication instruction. In Keitt , the defendant was convicted of first-degree burglary. 153 N.C. App. at 672, 571 S.E.2d at 36. The defendant told the arresting officer that "he had gotten so drunk [on the evening of the burglary] that he couldn't tell [the officer] exactly when he left from where him and his friends were drinking." Id. at 673, 571 S.E.2d at 36. Also that night, the defendant attempted to ride a bicycle into traffic, but once he reached the other end of the road he fell over and could not get back up. Id. The witness who observed the defendant riding the bicycle attended to him, "put his arm around [the defendant's] waist, and walked him to his home." Id. at 673, 571 S.E.2d at 36-37. The defendant "was so badly intoxicated he could barely stand on his own." Id. at 673, 571 S.E.2d at 37. The victim of the burglary also testified that "she smelled alcohol on [the] defendant and that when he was trying to leave her home, he had trouble navigating and fumbled with the door and screen door." Id. at 677, 571 S.E.2d at 39. The officer who arrested the defendant the morning after the burglary "smelled alcohol on the defendant." Id. Based on this evidence, we held that an inference existed for a jury to conclude that "the defendant was too intoxicated to form the necessary intent." Id.
In Mash , evidence was introduced showing that the defendant had been drinking copious amounts of beer and grain alcohol for six hours before killing the victim. 323 N.C. at 340-42, 372 S.E.2d at 533-34. Multiple witnesses noticed that the defendant "was pretty high," "out of control," had red eyes, was "staggering" and "sweating," "seemed dazed," "swerved" when he drove, and "could hardly talk." Id. at 341, 372 S.E.2d at 534. The defendant got into multiple unprovoked altercations with other people in his vicinity before killing the victim. Id. The victim, who lived across the street from where the fights were occurring, confronted the defendant at the urging of some of the witnesses. Id. The defendant responded by retrieving a car jack from his vehicle and beating the victim to death. Id. After he stopped striking the victim, the defendant walked over to the bystander who told him to stop. Id. The defendant then began to cry. Id. Our Supreme Court held that the "equivocal" nature of his actions both before and after the victim's death required a jury instruction on voluntary intoxication. Id. at 348-49, 372 S.E.2d at 538. It was entirely possible, the Supreme Court continued, that the defendant "was so impaired by alcohol that he ... was simply thrashing wildly at anyone he perceived as a threat." Id. at 349, 372 S.E.2d at 538.
The evidence of record in this case, when viewed in the light most favorable to Defendant, is insufficient to support a finding that Defendant was so utterly and completely intoxicated that his condition prevented him from forming specific intent. The minimal evidence showing the extent of Defendant's inebriation consists of (1) Regina's and her sister's observations; (2) Defendant appearing to talk to voices in his head; (3) the smell of alcohol emanating from him; (4) the marijuana and crack pipe found in his pocket; (5) Defendant's assertions that drugs caused him to act; and (6) his behavior being out of character from the way he normally treated K.D. Unlike the evidence produced in Keitt and Mash , the State's evidence tends only to prove, at best, Defendant's mere intoxication, which "is not sufficient to meet [his] burden of production." State v. Muhammad , 186 N.C. App. 355, 362, 651 S.E.2d 569, 574 (2007) (quotations and citation omitted).
While Defendant appeared intoxicated after the incident, there was scant evidence showing that he consumed drugs or was in any way intoxicated prior to, or during , the time of the crime. See State v. Wilson-Angeles , --- N.C. App. ----, ----, 795 S.E.2d 657, 667 (2017) (noting that "the lack of any evidence regarding [the] [d]efendant's level of alcohol consumption" is "of significant consequence" in determining whether "a defendant is entitled to a voluntary intoxication instruction"). In Defendant's phone calls to Regina, he told her that his drug use caused him to "snap[ ] out." K.D. also stated that she thought Defendant was hearing voices and talking to himself. Even assuming that evidence was substantial enough to prove Defendant's intoxication during the assault, Defendant's conduct before, during, and after the attack belies his argument.
During the attack, Defendant had the capacity to converse with K.D. and use the threat of killing R.M. as leverage to force her into submission. See Muhammad , 186 N.C. App. at 362, 651 S.E.2d at 574 ("[O]ther aspects of [a defendant's] behavior [can] determine whether a voluntary intoxication instruction is warranted, such as a defendant's ability to ... communicate with other people." (citing State v. Cheek , 351 N.C. 48, 75-76, 520 S.E.2d 545, 561 (1999) )). Additionally, before K.D. relented to Defendant's demands, Defendant was in the process of duct taping her hands to restrict her movements, implying that he "was in control of his actions," Herring , 338 N.C. at 276, 449 S.E.2d at 186, and had the mental wherewithal to understand how to enhance the success of his crime.
Moreover, immediately after the assault, Defendant went to K.D.'s room and profusely apologized for his actions, telling her that his life was in her hands. In State v. Brogden , after the defendant shot and killed the victim, he was " 'white in the face' and appeared nervous" and he told his wife, "[L]et's get out of here." 329 N.C. 534, 539, 407 S.E.2d 158, 162 (1991) (alterations in original). As our Supreme Court noted in Brogden , Defendant here "was able to recognize the gravity of what he had done" and unsuccessfully tried to make amends. Id. at 548, 407 S.E.2d at 167.
Also, the evidence included Defendant's actions that facilitated his crimes before he became intoxicated. Defendant, who normally complained about Regina playing bingo, encouraged her to leave that night. Defendant also called K.D. when she was at her boyfriend's house to come back home because, as he said, it was getting late-leaving him and K.D. as the sole occupants of the residence. And evidence of Defendant's demeanor prior to the attack shows he was still behaving toward K.D. in his fatherly manner. At this point, a reasonable fact-finder could come to the conclusion that, not only was he unintoxicated, Defendant "took deliberate actions that suggest a clear purpose in carrying out [the crime]." Wilson-Angeles , --- N.C. App. at ----, 795 S.E.2d at 667.
Although Defendant argues that the voices in his head are a significant indicator of severe intoxication, the State did not present any evidence establishing a significant nexus between Defendant's mental state[9] and his consumption of alcohol and drugs. See State v. Surrett , 217 N.C. App. 89, 97, 719 S.E.2d 120, 126 (2011) ("Neither party presented evidence regarding crack cocaine's effect on [the] defendant's mental state."). Only the smell of alcohol was found on Defendant and no physical proof in the record exists showing that Defendant consumed the marijuana or used the crack pipe before the attack. Any rationalizations Defendant makes excusing his culpability because of his drug consumption are betrayed by the countervailing evidence that he understood "what he intended to do and ... the nature and consequences of his act[ions]." State v. Medley , 295 N.C. 75, 80, 243 S.E.2d 374, 378 (1978). Despite K.D.'s observations that Defendant might have been talking to people in his head, there is no evidence that these voices, which were not attested to be caused by his intoxication, prevented him from having the "capability to formulate the necessary plan, design, or intention." Wilson-Angeles , --- N.C. App. at ----, 795 S.E.2d at 667 (quotations and citation omitted).
Because Defendant did not meet his burden that he was so completely and utterly intoxicated that he was incapable of forming the specific intent to commit attempted rape, we hold that the trial court did not err in refusing to instruct the jury on Defendant's voluntary intoxication.
NO ERROR.
Report per Rule 30(e).
Judges STROUD and ZACHARY concur.

Pseudonyms are used to protect the identities of the victim and the juvenile. Regina also has an older son but no information is given from the record other than his name and age.

The transcript is unclear as to whether Defendant had vaginal intercourse with K.D. This discrepancy is immaterial because the relevant conviction was for attempted first-degree forcible rape.

Although the record only contains the State's motion to amend the indictment, Defendant acknowledges that the indictment was amended.

The State notes that these transcripts were not admitted for their truth, but rather only to show Defendant's "state of mind and consciousness of guilt." While it is true that the trial court's instruction to the jury stated as such, no objection was raised when the evidence was admitted and the oral recordings of those conversations were played for the jury. Even presuming that we can review the phone conversation transcripts for their truth, as discussed infra , Defendant cannot meet his burden for a new trial.

The record does not indicate why the assault by strangulation and kidnapping charges were not tried.

This provision was amended in 2017. This appeal is governed by the 2015 version of the statute because the assault occurred in 2016.

The only other means to convict a defendant for first-degree forcible sexual offense besides using a dangerous or deadly weapon is proof that he inflicted serious personal injury or "commit[ted] the offense aided and abetted by one or more other persons." Id. § 14-27.26(a)(2)-(3).

Defendant's voluntary intoxication argument only applies to the attempted rape conviction. The jury convicted Defendant for the completed offense of first-degree forcible sexual offense, which does not have a specific intent element because it "is inferred from the commission of the act." State v. Daughtry , 340 N.C. 488, 516, 459 S.E.2d 747, 761 (1995) (quotations and citation omitted).

Evidence concerning Defendant's inner-voices could also be argued to be "more appropriately relevant to the defense of insanity," rather than voluntary intoxication. Gerald , 304 N.C. at 522, 284 S.E.2d at 319. In Gerald , the defendant drank a mixture of liquor, wine, and soda, and was told by his doctor to avoid drinking because the effects of alcohol would "affect[ ] his mind" following a surgical "operation on his head." Id. But the trial court in Gerald , in contrast to Defendant's trial, also instructed the jury on the insanity defense.